BANK OF MONANGO, OF MONANGO, NORTH DAKOTA, a
    Corporation, Appellant, v. ELLENDALE NATIONAL BANK,
    OF ELLENDALE, NORTH DAKOTA, a Corporation, Respondent.

(40 A.L.R. 889, 201 N. W. 839.)

**Banks and banking — bank holding liberty bonds as collateral held bailee,
    required to exercise ordinary diligence and reasonable care in trans-
    mission thereof.**

1. Where M. Bank sent to E. Bank the note of its cashier for $4500, payable to E. Bank, and $6000, par value, Liberty Loan Bonds, payable to bearer, as collateral, for purposes of securing a loan, and, where E. Bank received such note and bonds, indorsed the note, and then sent the same by registered mail without insurance to its Federal Reserve Bank for purposes of re-discount, as if its own, and where, through a robbery of the U. S. Mails in the course

---

Note.—Liability of bank for loss of liberty bonds and war savings stamps, see annotation in 40 A.L.R. 899.

of transmission, the note and bonds were stolen and lost, it is held, in an action to recover the value of the stolen bonds, for reasons stated in the opinion,—

That the E. Bank was a bailee of the bonds with the duty imposed in a banking transaction of exercising ordinary diligence and reasonable care in the transmission of the same.

**Banks and banking — rules applicable to transmission of currency apply to care required in transmission of liberty bonds.**

2. That Liberty Loan Bonds, payable to bearer, carry no earmarks of identification, varying substantially from those to be applied to currency and, hence, rules applicable to currency, in its transmission, should be similarly applied to such bonds, in transmission, in ascertaining the exercise of ordinary diligence and of reasonable care.

**Banks and banking — bailee sending liberty bonds by uninsured, registered mail held liable for loss by theft.**

3. That, where in the ordinary course of banking transactions it was known to the E. Bank that an available responsible method of transmission of currency, bonds, and other valuables existed, either by express or registered mail insured, without practical cost and without chances of loss, which was as available to it as the method selected, which was a method with chances of loss and without responsibility, the E. Bank failed in its duty to exercise the ordinary diligence and reasonable care required under the circumstances and must suffer the loss sustained.

**Banks and banking — failure to establish custom in transmission of bonds does not negative the performance of the duty of reasonable care.**

4. That the failure to establish a specific custom concerning the transmission of Liberty Loan Bonds and the acts of the M. Bank in transmitting the bonds, did not negative the performance of the duty of reasonable care imposed upon E. Bank.

Opinion filed December 17, 1924.

Banks and Banking, 7 C. J. § 332 p. 644 n. 21.

In District Court, Dickey County, *Wolfe,* J.

Action to recover the value of Liberty Loan Bonds, stolen while in transit. Plaintiff has appealed from the judgment and an order denying a new trial.

Reversed with directions to enter judgment for plaintiff.

*Lauder & Lauder* and *E. E. Cassels,* for appellant.

Banks are instituted, and their buildings constructed, for the deliv-

ery in and safe-keeping of money and money securities; and these bonds were deposited in defendant's bank for greater security of the bonds; that is, for safe-keeping. Whitney v. National Bank, 55 Vt. 155, 45 Am. Rep. 598; 21 R. C. L. p. 664, ¶ 27.

The burden of proof is on the bailee to establish both the loss of the property pledged and his exercise of due diligence and care. 31 Cyc. 828.

The evidence of the nature of the property and of all the circumstances connected with its keeping by the pledgee is admissible. The burden of proof is on the bailee to establish both the loss of the property and his exercise of due diligence and care. 31 Cyc. 828; Mansuer-Tebbetts Imp. Co. v. Carey, 1 Ind. Terr. 572, 45 S. W. 120; Oudekirk v. Cent. Nat. Bank, 119 N. Y. 263, 23 N. E. 875.

It necessarily follows from the nature of the obligation and the refusal to return the property, that the burden of showing the circumstances of the loss rests upon the bailee, and unless the evidence shows the exercise of due care by him, according to the nature of the bailment, he will be held responsible for the breach of his contract and return the property bailed. Oudekirk v. Central Nat. Bank, supra; Patterson v. Syracuse Nat. Bank, 80 N. Y. 98; Caldwell v. Mohawk Bank, 64 Barb. 346; Collins v. Bennett, 46 N. Y. 490; Cutting v. Mahlor, 78 N. Y. 454; Russell Mfg. Co. v. N. H. Steamboat Co. 50 N. Y. 121.

The bonds having been left with the bank as collateral security for the payment of the note, and after the payment of the note not delivered to plaintiff upon demand, is prima facie evidence of conversion, and the bank cannot accuse defendant without showing affirmatively what had become of them or some good ground for not returning them. The burden of exculpation is upon the bank. Caldwell v. Mohawk Bank, supra; L. C. N. Bank v. Smith, 62 Pa. 47; F. N. Bank v. Zent, 39 Ohio St. 105; Story, Bailm. § 339; T. N. Bank v. Boyd, 22 Am. Rep. 35.

To remit does not, ex vi termini, mean to transmit by mail. Its etymological signification is to send by bill, check, or otherwise, from one person to another, at a distance more or less remote from each other. Morton v. Morris, 31 Ga. 378.

In every community negligence is to be judged of by the state of

society, the habits of business, the general usages of life, and the dangers as well as the institutions peculiar to the age. Story, Bailm. § 11.

It is a general rule that in order to absolve a debtor who transmits money by mail to his creditor for the payment of his debt from the hazard of loss in the transmission it is necessary that he show authority from the creditor to remit in this manner or a usage or course of dealing from which such course may be inferred. Williams v. Carpenter, 36 Ala. 9; Burr v. Sickles, 17 Ala. 428; Morton v. Morris, 31 Ga. 378; Garr v. Taylor, 128 Iowa, 636, 105 N. W. 125.

*Fred J. Graham,* and *Divet, Holt, Frame & Thorpe,* for respondent.

The question whether the pledgee has exercised due diligence and care in keeping the pledged property, is for the jury to determine. 31 Cyc. 828.

The plaintiff must in all cases suing him for the loss of goods, allege negligence and prove negligence. This burden is never shifted from him. If he prove the demand upon the warehouseman and his refusal to deliver, these facts unexplained are treated by the court as prima facie evidence of negligence; but, if, either in the course of his proof or that of the defendant, it appears that the goods have been lost by theft, the evidence must show that the loss arose from the negligence of the warehouseman.

This rule was followed in Kaiser v. Latimer, 9 App. Div. 36, 41 N. Y. Supp. 94; Steward v. Stone, 127 N. Y. 500, 14 L.R.A. 215, 28 N. E. 595; King v. New Brunswick S. S. Co. 36 Misc. 555, 73 N. Y. Supp. 999; Claflin v. Meyer, 75 N. Y. 260, 31 Am. Rep. 467.

Ordinary diligence is not disproved even presumptively by mere theft, but the proper conclusion must be drawn from weighing all the circumstances of the particular case. Story, Bailm. § 338; 1 Am. & Eng. Enc. Law, 661, and cases cited; Ware v. Squyer, 83 Am. St. Rep. 390.

As the liability of such a bailee if the pledge be stolen, the rule seems to be now well settled that he is not absolutely liable nor absolutely excusable. If the theft is occasioned by his negligence, he is responsible; if without any negligence, he is discharged—such a bailee being bound for ordinary care, and answerable for ordinary negligence. Pettey v. Overall (Ala.) 94 Am. Dec. 634.

The finding by the court of the asportation is also coupled with the

finding that the same was without fault or negligence on defendant's part, and this finding amounts to more than a mere conclusion of law, but involves the essential fact that the pledgee exercised due care as bailee of the property. Clark v. Railway Company, 28 Minn. 69, 9 N. W. 75. A liberal but fair construction of this finding includes the view that the jewelry was kept in a reasonably safe place, that ordinary care was used in protecting the same from theft, and in connection with the conclusion that it was unlawfully taken by parties unknown, necessarily implies that the loss happened without fault or negligence on the part of the defendant, and necessarily relieved him from a claim for damages for its conversion. Ware v. Squyer (Minn.) 84 N. W. 125.

Duty to insure, if it exists at all, does not involve a question of negligence, but arises by reason of an implied term of the contract, based upon known usage. Note in Ann. Cas. 1913A, 144 and other cases under this note; 6 C. J. p. 1113.

The acquiescence in the particular practice may be shown by previous dealings between the parties based on such usage or practice. Elliott, Contr. § 1685, p. 1016, and cases cited.

A usage existing among any number of banks will not affect one that has not adopted it. 7 C. J. 587, § 219; Williams v. Bank (Md.) 17 Atl. 382.

A usage or custom to have the force and effect of law or of an implied contract or of a constructive delivery of goods must be clearly and definitely proven; and, where the evidence is uncertain and also contradictory, the usage or custom is not established. 12 Cyc. p. 1100.

A custom or usage is a fact that may be stated by a witness in the first instance, without stating the incidents or instances within his knowledge by which he became possessed of the knowledge of the custom, the same as he may testify to the general reputation of a witness. 1 Greenl. Ev. (Redf. ed.) §§ 128, 129 (id. 2d ed. 148–152); Conner v. Company (Ind.) 45 N. E. 666; Lawson, Custom & Usages, pp. 34, 35.

The custom must be clearly proved, and where the evidence is uncertain and contradictory, the custom is not established. 17 C. J. 522, § 91.

A usage existing among any number of banks will not affect one that

has not adopted it. 7 C. J. 587, § 219. Williams v. Bank (Md.) 17 Atl. 382.

Isolated instances of a certain practice in a particular bank or proof of a few instances of dealings in one or two other banks, do not establish general usage. A particular banking usage must apply to a place rather than to a particular bank, and must be the rule of all the banks in that place. 17 C. J. 457.

Since a usage is binding only on the theory that the parties have made a part of their contract, it will not be admitted where the evidence does not tend to show any intention on the part of the parties to contract with reference thereto and nothing can be gathered from the surrounding circumstances to lead to the conclusion that they did rely upon it. 17 C. J. 496, see note 91.

## Statement

BRONSON, Ch. J. Plaintiff bank seeks to recover from defendant bank the value of certain Liberty Bonds stolen in transit. Trial was had to the court without a jury. Plaintiff has appealed from the judgment in defendant's favor and from an order denying a new trial.

The material facts, in substance, are:—Plaintiff was and is a State Bank, at Monango, N. D.; Defendant, a National Bank, at Ellendale, N. D., a town some 12 miles South of Monango. The Ellendale bank had operated as a depositary or reserve bank for the Monango bank. The Ellendale bank was a member of the Federal Reserve Bank in Minneapolis, Minn. As such, it was entitled to rediscount its paper with such Federal Reserve pursuant to the rules and regulations of such Federal Reserve. The Monango bank was not a member of such Federal Reserve and was not entitled, as a nonmember, to rediscount privileges with such Federal Reserve. In June, 1920, the Monango bank was in need of money for its reserve. Its cashier consulted with the cashier of the Ellendale bank for the purpose of securing some money. Pursuant to the testimony of the cashier and assistant cashier of the Ellendale bank, the cashier of the Monango bank was informed that the Ellendale bank could not make to the Monango bank any loan; then they talked about a method of getting a loan through the Federal Reserve; they consulted circulars of information from the Federal Re-

serve; they learned that a loan through the Federal Reserve could be made to the Ellendale bank by discounting paper, either the bank's or its customer's, along with collateral security; they ascertained that such discounting could not be made by a State Bank that was not a member of the Federal Reserve; they secured information that a customer's note of a National Bank, secured by Liberty Loan Bonds, could be accepted by the Federal Reserve for ninety days; they learned that it was necessary for such note to be made payable to the Ellendale Bank; that it be indorsed by the Ellendale Bank and by it be guaranteed; they knew that any such note could not be rediscounted unless it belonged to the Ellendale Bank and that it was necessary that such be represented to the Federal Reserve as belonging to the Ellendale Bank, a member thereof; accordingly, the cashier of the Monango bank was informed that the Ellendale bank would assist him in getting a loan through the agency of the Federal Reserve, and, as the rate of the Federal Reserve was 6%, it would charge the Monango bank $6\frac{1}{2}$% so as to secure from the Monango bank one-half of one per cent as compensation for its service to be rendered. So it was arranged that the cashier of the Monango bank should send to the Ellendale bank his note, and with it, by registered mail, the collateral Liberty Loan Bonds, and that then the Ellendale bank would endorse the note and send the same, together with the collateral Liberty Loan Bonds by registered mail to the Federal Reserve in Minneapolis; that in the arrangements thus made nothing was said about insuring the Liberty Loan Bonds.

In general the testimony of the cashier of the Monango Bank does not differ concerning the initial arrangements above outlined excepting that he insists that he made an application for a loan to the Ellendale bank and that the Ellendale bank made it to him and his bank through the Federal Reserve and, further, that nothing was mentioned between the parties concerning the method to be used in transmitting the collateral Liberty Loan Bonds.

On June 17th, 1920, the Monango bank sent the personal note of the cashier for $6000, due in 90 days, and $6000 in Liberty Loan Bonds, interest coupon bonds, payable to bearer, and on the following day sent, as additional collateral, $1500 additional in such Liberty Loan Bonds. This note and collateral was so sent by registered mail, in accordance with the direct testimony of the cashier of the Monango bank, but later

he qualified this testimony by stating that upon checking up the matter he discovered that he had taken in his grip, personally, the Liberty Loan Bonds to the Ellendale bank and this later testimony was corroborated by the testimony of the Postmaster at Ellendale that in June, 1920, no registered packages were received from Monango at Ellendale.

The Ellendale bank received the note which was payable to it, endorsing the same, and then, with the Liberty Loan Bonds so received, sent the same to the Federal Reserve Bank at Minneapolis by registered mail without insurance. Such note and bonds were received by the Federal Reserve Bank, rediscounted pursuant to its rules and regulations and the Monango Bank received credit therefor from and through the Ellendale bank. For such transaction the Ellendale bank received as compensation the sum of $5.00. This transaction was subsequently closed by payment, without loss.

About December 1st, 1920, the Monango bank again desired to borrow money. By telephone conversation had with the cashier of the Ellendale bank arrangements again were made for rediscounting the note of the cashier of the Ellendale bank with the Federal Reserve of Minneapolis by and through the Ellendale bank in the same manner as the first transaction. Accordingly, on Dec. 2nd, 1920, the cashier of the Monango bank sent to the Ellendale bank his note for $4500, due in 90 days, with interest at 6½% after maturity. (The Federal Reserve collected interest in advance.) He also sent as collateral $6000, par value, in Liberty Loan Bonds, coupons attached, payable to bearer. These papers were sent by registered mail from Monango to Ellendale, uninsured. They were received by the Ellendale bank and on the next day sent by the Ellendale bank to the Federal Reserve bank at Minneapolis, with a letter requesting the rediscount of the note and the crediting of the proceeds to the account of the Ellendale bank. The note was endorsed by the Ellendale bank through its cashier. The note and the bonds were sent by registered mail uninsured. When the mail train carrying this registered letter containing the bonds reached the suburbs of Minneapolis it was set upon by highway robbers and these bonds, along with many other valuables, stolen. Accordingly, the bonds never reached the Federal Reserve Bank, the note was never rediscounted and the proceeds thereof never received. The note and Liberty Loan Bonds have not since been traced nor found. This action accordingly

was instituted to recover the value of the bonds from the Ellendale bank. The complaint sets forth two causes of action. One, for the negligent omission of the defendant to have the bonds insured in the transmission of the same to the Federal Reserve Bank, although the universal custom was so to do; and the other, alleging in contract the agreement of the Ellendale bank to secure a discount of the Monango bank's note for a compensation and to transmit the collateral to the Federal Reserve Bank with care in the observance of the usual customary precautions and consonant with the general custom existing among bankers to insure bonds for transmission and that the Ellendale bank failed and violated its duty in that respect by transmitting the bonds by registered mail without insurance. Defendant's answer in defense alleges that it sent to Minneapolis by registered mail the bonds pursuant to directions of the Monango bank and in accordance with the usual custom; that in receiving such bonds it was acting gratuitously for the accommodation and benefit of the Monango bank.

In the evidence it appears that various insurance companies had provided a method of insuring the transmission of Liberty Loan Bonds or other valuables through registered mail; that this method consisted in filling out an original blank listing the fact of the registered mail and the contents thereof; that the original blank was sent to the insurance company and a copy thereof kept by the insured; that it would have cost 10 cents per thousand or 60 cents to have insured these bonds in transit from Ellendale to Minneapolis; that the Ellendale bank had arrangements with an insurance company and the blanks through which such insurance might have been accomplished; that likewise the Monango bank had a similar arrangement. The cashier of the Monango bank testified, in effect, that it was his custom to always insure registered mail containing Liberty Loan Bonds; that he violated his custom in sending the bonds to the Ellendale bank in December for the reason that it so happened that he had only a few minutes before train time and was compelled to hasten in order to get the package registered for the mail on the train. The officials of the Ellendale bank testified to the effect that it was not their custom or usage to insure registered packages containing Liberty Loan Bonds. ' Their explanation was that they never had suffered a loss; that they were not fully aware that the U. S. Government afforded no protection when the amount involved

was over $50.00. Otherwise, they testified that in shipping currency they shipped by express for the reason that it was safer through the protection afforded by the responsibility of the express company.

Many bankers were called to testify to the usage, custom or practice among bankers for insurance in the transmission of currency or Liberty Loan Bonds by registered mail. These men were those concerned or who had been concerned with the operation of North Dakota Banks, both State and National, in the relative vicinity of the Ellendale banks. The general consensus of the testimony of such bankers, some nine in number, was to the effect that it was the usual and customary practice in the transmission of valuable papers, such as Liberty Loan Bonds, to send them either by express or by registered mail insured and that this custom had been existing from six to ten or more years; that the cost of securing such insurance varied from 8 cents to 12 cents per hundred, dependent upon the insurance company and the distance of transmission. A few banks, in behalf of the defendant, namely, five, testified to the effect that it was not their custom to insure bonds when sent by registered mail and that they were not familiar with any recognized custom so to do. Nevertheless, each of such bankers admitted that they possessed facilities through insurance to so insure registered packages; that some chances were taken in sending bonds or money by registered mail without insurance; some did secure insurance through registered mail when large sums of money or currency were sent, and some sent by express when large sums of money or currency were involved. Plaintiff attempted to introduce into evidence a circular letter from the North Dakota Bankers' Association, issued in October, 1919, to the effect that insurance could be secured in the shipment of currency. This letter was not received by the court. Plaintiff also offered in evidence a circular letter of the Federal Reserve Bank dated March, 1918, advising all banks and trust companies that all incoming shipments be insured under their registered mail policy. Also some evidence was offered and some received to the effect that correspondent banks in the Twin Cities had issued advice or letters to the effect that Liberty Loan Bonds could be sent by registered mail insured.

The trial court, among other things, found that in the summer of 1920 plaintiff applied to defendant to borrow $6000; that then defendant did not have any money to loan plaintiff; that it was agreed

that plaintiff's cashier should issue his note for $6000 secured by Liberty Loan Bonds as collateral; that defendant would obtain from the Federal Reserve Bank a loan of $6000 by rediscounting the note of plaintiff's cashier; that such note was made for $6\frac{1}{2}\%$, the discount rate being 6% and the consequent profit of defendant one-half of 1%; that pursuant to the arrangement the note for $6000 with bonds was sent by registered mail to the Federal Reserve Bank without insurance; that upon receipt thereof defendant gave plaintiff credit on its books for the amount; that the note and the bonds were received by the Federal Reserve Bank and later the note was paid and the bonds returned to plaintiff; that about Dec. 1st, 1920, plaintiff applied to defendant for a loan of $4500 secured by Liberty Loan Bonds; that defendant informed plaintiff that it did not have the money but could handle the matter as the former loan had been handled excepting that credit on defendant's books could not be given plaintiff until defendant had actually received credit for the note at the Federal Reserve Bank; that plaintiff agreed to forward the note under such conditions and knew if the loan was to be made that the note, with the Liberty Loan Bonds as collateral, was to be transmitted to the Federal Reserve Bank; that plaintiff's cashier made his note for $4500, due in 90 days, inclosed the same, with the Liberty Loan Bonds as collateral, and sent same to the defendant at Ellendale by registered mail without any insurance; that defendant endorsed the note to the order of the Federal Reserve Bank and sent the same together with the Liberty Bonds, to the Federal Reserve Bank in Minneapolis by registered mail but without insurance; that when the arrangement was made for discounting the note and the transmission of the Liberty Loan Bonds, no directions were given to defendant by plaintiff directing that the bonds be insured, and at no other time were directions so given; that the plaintiff and defendant did not contract or deal with reference to any general custom or usage among bankers in North Dakota requiring defendant to insure the registered package against loss by burglary, or robbery, or against loss in its transmission in registered mail, and that there was no custom or usage established by the testimony in this case to that effect. As conclusions, the trial court found that the transaction amounted to the making of a loan by defendant to plaintiff; that defendant was the pledgee of the securities, with the understanding on

plaintiff's part that the same would be transmitted to the Federal Reserve Bank and were to be rediscounted as a part of the necessary proceedings in making the loan; that the measure of pledgee's duty was to use ordinary care in reference to the conservation and transmission of the bonds and that the registration of the bonds in the U. S. mail was the use of ordinary care and discharged the pledgee's duty in that respect; that there was not sufficient evidence in this case to show any custom or usage with reference to the insurance of the bonds by bankers in transmitting the same by registered mail and that no custom or usage was established by which it could be concluded that the parties contracted with reference to any custom or usage; that the loss of the bonds should fall upon plaintiff bank. Judgment was ordered accordingly and was so entered dismissing the action. The learned trial court, in a memorandum opinion, based its conclusions largely upon the thought that the case at bar could not be distinguished from one where the pledgee kept the pledged property in his own possession in a safe ordinarily kept for such purpose and where, without insurance being carried, a robbery occurred and the property thereby lost. The trial court was of the opinion, therefore, that the fact of not securing insurance did not constitute lack of due care. However, the trial court expressed doubt concerning his conclusions to the extent that he stated that a matter of such far-reaching possibilities at least ought not to be permitted to rest upon a one-man determination.

## Contentions.

Upon this appeal plaintiff maintains that the transaction, viewed as a loan made by defendant to plaintiff created the duty on defendant's part to use ordinary diligence and reasonable care, which was violated by the transmission of the bonds through registered mail without insurance; that if the transaction be regarded as an employment, likewise, there was a violation of duty by the defendant through its negligence in failing to secure insurance in the transmission of such bonds by registered mail.

On the contrary defendant maintains that the transaction should be viewed as an employment but that, in any event, it was a bailment, with the question involved of whether the bailee used the proper care

required concerning pledged securities. In this regard defendant asserts that the prime question is whether it was the duty of the Ellendale bank to insure the bonds in transit. In this respect it is maintained that defendant used a safe method of transportation; that the robbery would have occurred just the same if the bonds in transit had been insured; that in the course of transmission of registered mail out of Ellendale no loss theretofore had ever been reported; that the evidence fails to establish the existence of any usage or custom to insure bonds by registered mail and that the findings of the trial court are amply sustained with reference to the violation of any duty and to the absence of negligence by defendant in the transmission of the bonds.

## Opinion.

Upon the record and contentions of the parties there are practically no disputed questions of fact. If the trial court had made further findings and conclusions to the general effect that defendant, through the usual and ordinary methods of transmitting valuables, such as Liberty Loan Bonds, known to defendant and existing in banking transactions, knew and could have availed of a responsible and safe method of carriage and in violation of its duty neglected so to do, a judgment might well be sustained upon the findings in plaintiff's favor. Learned counsel for both parties have presented able briefs. The issues were well tried in the trial court; they have been well presented to this court. The trial court found the transaction to be a loan. From the briefs it is, in many respects, immaterial whether the transaction be considered a loan or an employment. In any event, a bailment was created with the duties of a bailee imposed upon defendant as a person in charge of pledged securities.

. As defendant has ably stated, the prime question is whether it was the duty of the Ellendale Bank to insure the Liberty Loan Bonds in transit by registered mail. The transaction involved a banking transaction; it concerned ordinary methods pursued among bankers in a banking transaction. The Ellendale Bank manifestly assumed some duty as a banker in a banking transaction concerning the transmission of these bonds to the Federal Reserve Bank. In fact, the bonds were the property of the Monango Bank; in form, the Ellendale bank as-

sumed an ownership and control concerning these bonds for purposes of enjoying and securing its rediscount privileges with the Federal Reserve Bank; in form the Ellendale bank treated the note sent as its note, and the bonds transmitted as its bonds, for purposes of securing a rediscount from the Federal Reserve. In other words, the Ellendale bank pretended to act, intended to act, and did act as a bank engaged in a banking transaction in accordance with the ordinary methods used by bankers and pursuant to banking rules and practises. Defendant was not in the position of a gratuitous bailee; it acted for a reward; it was chargeable as a bailee with the exercise of ordinary diligence and of reasonable care and it was liable for its negligence in that regard. 7 C. J. 644.

Accordingly, by virtue of the contract and duty that arose between the parties by reason of the transaction, it must be presumed that the parties, as bankers dealing and contracting concerning a subject matter involving a banking transaction, contemplated that performance would occur with the exercise of such ordinary diligence and of such reasonable care as might and should be expected and pursued in the ordinary course of the banking business involving such matters. See First Nat. Bank v. Davis, 114 N. C. 345, 41 Am. St. Rep. 795, 19 S. E. 280; Marine Bank v. Fulton County Bank, 2 Wall. 252, 17 L. ed. 785; Lloyd Mortg. Co. v. Davis, 51 N. D. 336, 36 A.L.R. 465, 199 N. W. 872.

It is practically conceded that, if the subject matter involved had been currency instead of bonds, it would have been an act of negligence and violation of duty to send the currency by registered mail without insurance. Defendant's answer is that the rule applicable to currency is not applicable to bonds since it is the duty of the sender, when currency is involved, to purchase a draft and not to send currency at all. However, in this respect it must be noted that between bankers currency must be transmitted in settlement of banking transactions; for it is well known, as a matter of ordinary knowledge in banking circles, that currency is shipped and must be shipped, pursuant to orders therefor of settlements had between bankers.

May it be maintained successfully or admitted that the transmission of $6000 in currency, in a banking transaction between banks, by registered mail uninsured, or in the ordinary mail uninsured, is the exercise of ordinary diligence and of reasonable care to protect against loss

when it is known that such methods are without responsibility in the event of loss and when it is further known that there are other existing and responsible methods of transmission, equally available, that will prevent actual loss? We must answer in the negative. Whether the transmission of the currency be by registered mail, by registered mail insured, by ordinary mail, insured or not insured, or by express, all may be equally safe or be equally subjected to the same hazards, so far as fire, honesty of employes, robbery from without, etc., and in fact, in the same vehicle of conveyance; but a wide distinction may be drawn between the actual protection against loss afforded in the one case or the other.

Thus, if currency, instead of Liberty Bonds, had been the subject matter of the collateral to be transmitted, what would have been the duty of defendant in selecting an agency of transmission? Would its whole duty have been performed by transmitting such currency, either in the ordinary mail or by registered mail uninsured? The answer must be made that a violation of its duty may arise for the reason that a responsible method of transmission has not been selected when otherwise one existed. In other words, it may be the duty of a bailee in such case, in the exercise of ordinary diligence and reasonable care, to transmit the valuables by a responsible method of carriage. In such case defendant's whole duty is not necessarily measured by the fact that a transmission by ordinary mail or by registered package alone is as safe if not safer than transmission by express, or that such transmission is as safe as if transferred by registered mail insured, so far as in any event the liability of loss by theft or otherwise is concerned. If such were the test it might be capable of proof, so far as highway robbery is concerned, that an ordinary letter, not registered, is safer in transmission, although containing currency, than a registered letter containing currency. Hence, it follows that the exercise of ordinary diligence and of reasonable care may require a party who sends valuables through an agency selected by him, to choose a responsible method of carriage available to him. In this regard answer may be made to the reasoning of the trial court to the general effect that the question of defendant's duty to insure should be considered as if the bonds had been left with and kept in the bank without insurance. A clear distinction should be drawn between the duty imposed upon a bank where it keeps either

currency or bonds in its vault, or safe, considered in the ordinary course of the banking business reasonably proper and safe, and its duty, in transmission of such currency or bonds, to exercise ordinary diligence and reasonable care to prevent loss by selecting a responsible method of transmission. The question involved is not merely the question of a duty to insure. The question is the fact of the exercise of ordinary diligence and of reasonable care which may require, under the circumstances, an insurance of a responsible method of transmission. Where transmission by express is had no insurance in form is taken but insurance in fact exists because of the responsibility assumed and granted by the express companies; thus, may the same insurance in fact be accomplished by registered mail insured. Apropos, the suggestion of the trial court, what would be said concerning breach of the duty of the defendant, if it had left $6000 in currency upon its outside counter when through mistake or carelessness it failed to place the same in its robber-proof, so termed, safe, after banking hours and thereby, thereafter during the night, such currency was stolen by a bank robber who could not blow the safe?

Concerning the Liberty Loan Bonds involved, they bore no earmarks which served to prohibit easy sale or disposition by any bearer. Practically considered, they were transferable from hand to hand readily, like currency. Particularly this has been so since, as a result of circumstances incident to the World War, large quantities of Liberty Loan Bonds have become engaged in the ordinary channels of trade. In a manner, therefore, Liberty Loan Bonds could be handled and have been handled over the counter in banking circles the same as currency. Practically, therefore, a bailee, in the transmission of large quantities of Liberty Loan Bonds payable to bearer, should be chargeable with a duty similar to that required in the transmission of currency. The fact that the proof in the record may be considered insufficient to establish a custom or usage that Liberty Loan Bonds in transmission should be sent by registered mail insured does not negative the duty of ordinary diligence and reasonable care imposed upon defendant. The record, otherwise sufficiently discloses the ordinary methods pursued in banking transactions when currency and other valuables are transmitted, concerning all of which defendant was apprised and had knowledge thereof.

Likewise, the acts of the Monango bank, in sending the bonds involved by registered mail uninsured, does not absolve the duty of reasonable care imposed upon defendant, as bailee, in the absence of specific agreement to the contrary established. See note in 2 A.L.R. 1646. The record fully discloses that well known agencies existed for the purpose specifically of providing a safe, responsible method of transmission where the transmission of currency or Liberty Loan Bonds or other valuables is necessary. The defendant was fully acquainted with the methods available, whether by express or by registered mail insured. It had available for it, in the transmission of these Liberty Loan Bonds, a shipment either by express or by registered mail insured. Defendant possessed blanks of an insurance company and knowledge of the method by which, with little labor and inconsiderable expense, Liberty Loan Bonds or currency could be insured through registered mail. Defendant knew that the transmission of either currency or Liberty Loan Bonds by ordinary mail or by registered mail did not afford a responsible, safe method of transmission. It knew, or ought to have known, that the government specifically had disclaimed liability for loss occuring through the ordinary mail or through registered mail in excess of a very limited amount. Thus, the defendant as bailee with the duty imposed upon it of transmitting the Liberty Loan Bonds, as collateral, had presented to it several methods of transmission. One, by ordinary mail which it knew to be without responsibility on the part of the government; likewise, another method, by registered mail, without responsibility; but a transmission in another method, by registered mail with insurance, or by express, afforded a responsible and safe method of transmission. Furthermore, under such circumstances, defendant knew that in the ordinary course of banking transactions it was proper to send currency either by express or by registered mail insured. It knew, or ought to have known, that Liberty Loan Bonds, payable to bearer, might be subjected to the same hazards as might apply to currency.

In other words, upon the record and considering the nature of the subject matter involved, the defendant had pointed out to it in advance a responsible, safe method in accordance with ordinary methods pursued in banking transactions, and another method, not responsible and which might occasion loss. May it be said that an ordinarily prudent

man, exercising ordinary diligence and reasonable care, under such facts and circumstances, would select a method of transmission, not responsible and affording opportunity for loss at a time when he knew and could avail of a responsible, safe method of transmission practically without expense and assuredly without loss?

We are of the opinion that, under such facts and circumstances, the defendant failed to exercise the ordinary diligence and reasonable care required. It failed in its duty to select a responsible method of transmission that would prevent actual loss. It follows, accordingly, that the liability for the loss sustained must fall upon defendant for violation of its duty. The judgment of the trial court is reversed and judgment ordered to be entered in plaintiff's favor for the value of the bonds, as stipulated between the parties, with interest and costs.

CHRISTIANSON, NUESSLE, JOHNSON, and BIRDZELL, JJ., concur.