[Civil Nos. 2785, 2786. Filed January 6, 1930.]

[283 Pac. 926.]

THE BASHFORD–BURMISTER COMPANY, a Corporation, and H. D. AITKEN, as an Officer and Stockholder of Said Corporation, Appellants, v. A. T. HAMMONS, Superintendent of Banks of the State of Arizona, HOMER R. WOOD, Special Deputy Superintendent of Banks of the State of Arizona, in Charge of the PRESCOTT STATE BANK, Prescott, Arizona, and an Arizona Corporation, Insolvent, and VERNON S. WRIGHT, State Treasurer of the State of Arizona, Appellees.

FRANK W. BOVILLE, Appellant, v. A. T. HAMMONS, Superintendent of Banks of the State of Arizona, and HOMER R. WOOD, Special Deputy Superintendent of Banks of the State of Arizona, in Charge of the Business and Affairs of the PRESCOTT STATE BANK, Prescott, Arizona, an Arizona Corporation, Insolvent, Appellees.

Messrs. Cornick & Crable, for Appellants.

Mr. John A. Ellis, for Appellees.

Mr. K. Berry Peterson, Attorney General, and Mr. Arthur T. LaPrade, Assistant Attorney General, for Appellee State Treasurer.

ROSS, J.—These two cases were consolidated in the trial court, and are here presented upon the one record. Both are suits to reach and subject the assets of the Prescott State Bank, hereinafter referred to as the insolvent or the insolvent bank, to their claims of indebtedness and for a preference. The defendants Hammons and Wood are, respectively, state superintendent of banks and deputy and as such the receivers thereof. The insolvent bank had been from at least December 19th, 1918, if not earlier, up to the date of its failure, November 25th, 1925, a designated depository of the county of Yavapai and of the state of Arizona. Upon the last date it had on deposit $270,739.76 of the county's and $158,093.91 of

the state's public moneys, secured by surety bonds and Liberty bonds of the United States. Of the latter kind of security the county held, on November 25th, 1925, $83,700, admittedly the property of the Commercial Trust & Savings Bank, hereinafter referred to as the savings bank, and the state held $12,500, admittedly the property of the Bashford-Burmister Company, hereinafter referred to as the B–B Company, for and on account of which securities the county and state had deposited an equivalent sum of public moneys.

Soon after the failure of the bank the county converted said Liberty bonds so held by it into cash, crediting the insolvent therewith, and the state was in the act of doing likewise with its securities when the B–B Company and H. D. Aitken, a director and stockholder, brought suit, at the same time replevying the $12,500 in Liberty bonds. Hence, in addition to the statutory receivers, Hammons and Wood, the state treasurer is made a defendant in cause No. 2785. The insolvent bank obtained possession of the $12,500 in Liberty bonds from their owner under the following agreement:

"This agreement made the 21st day of March, 1919, between the Bashford-Burmister Company, a corporation, first party, and the Prescott State Bank, a corporation, second party,

"Witnesseth: That for the consideration of One Dollar and other good valuable considerations, the first party has this day agreed to loan and does hereby loan and deliver to second party certain collateral for the use of second party in the protection of the deposit of public funds, to wit: (Here are described $12,500 in United States Liberty bonds.)

"This loan of collateral is for the period of two years, provided that first party shall have the right to the return of said collateral at any time on demand.

"In witness whereof the parties hereto have caused this instrument to be executed by their proper offi-

cers, thereunto duly authorized, the day and year hereinbefore first above written.

"BASHFORD-BURMISTER COMPANY,
"By JAMES A. HOPE, President.
"Attest: [Seal] A. W. EDWARDS, Secretary.
"THE PRESCOTT STATE BANK,
"By R. N. FREDERICKS, President.
"Attest: [Seal] L. C. DERRICK, Secretary."

The same kind of loan agreement was made between the savings bank and the insolvent bank as to the $83,700 in Liberty bonds deposited with the county treasurer. To recover said sum from the insolvent bank, cause No. 2786 is being prosecuted by Frank W. Boville, stockholder and creditor of the savings bank, who sues for himself and all others in like situation.

In cause No. 2785, the B-B Company seeks to recover from the state treasurer the specific bonds it loaned to the insolvent bank, or in lieu thereof to have impressed a trust in its favor upon the general assets of the insolvent bank in the sum of $12,500, the face value of bonds, and interest thereon, upon the theory that loan of bonds was *ultra vires* the powers of the B-B Company, and that the state had notice that such bonds belonged to the plaintiff and not to the insolvent bank.

In cause No. 2786, the plaintiff, Boville, insists that it was the duty of the receivers, upon taking possession of the insolvent bank and learning of its having pledged the $83,700 in Liberty bonds belonging to the savings bank to the county treasurer to secure deposits of county funds, to redeem said bonds with the insolvent's assets and to turn them over to the savings bank, and, having failed to do so, it is said the court should impress a trust in favor of the savings bank upon the assets of the insolvent bank for their value and interest.

These propositions were combated by defendants, and, upon the issues formed, the court took evidence, and at the close of the case made findings of fact and conclusions of law and entered judgment that plaintiffs take nothing.

From here on we will consider the cases separately, as there are facts in each distinguishing it from the other that should have a separate statement.

In cause No. 2785, the plaintiff B–B Company is a corporation engaged in the business of wholesaling and retailing general merchandise in Prescott and vicinity. Under its articles of incorporation it had no power or authority to lend its assets or property to the bank, or at all, and in lending the Liberty bonds it is obvious it exceeded its powers and that its act was *ultra vires.* It should recover its Liberty bonds from the state, unless it shall appear, as contended by defendants, that the stockholders of the B–B Company were fully advised of the loan and by their silence and acquiescence ratified and approved of such loan, or that the state was a *bona fide* purchaser for value. We will take up these two propositions in the order stated.

The B–B Company is described by counsel as a "closed corporation." It had seven stockholders, six of whom constituted its board of directors. H. D. Aitken, who was at the time of loan the treasurer of the company and also a director and stockholder, testifying, said:

"We (meaning the directors) were practically all the stockholders of the company. There were really not any other stockholders, except one in Detroit at that time, and I have not any doubt in the world but that Mr. Hope (president of the Bashford-Burmister Company) had written him all about it."

This same witness testified that the stockholders held annual and the board of directors semi-annual meetings. These meetings were over the period from

the date of loaning of Liberty bonds (March 21st, 1919) to the insolvent bank up to its insolvency (November 25th, 1925).

The court found that the loan was made by the B–B Company, and that no demand was ever made by it for the return of the bonds until November 25th, 1925, and that plaintiff H. D. Aitken, treasurer, director, and stockholder, and the B–B Company through its officers had knowledge that said loan was made on March 21st, 1919, and the purpose for which it was made.

We think these findings were justified, and that the court might have gone further and found from the evidence that all the stockholders knew of such loan and its purpose, and consented thereto. This presents the extraordinary situation of all but one of the stockholders meeting twice a year for six years as the board of directors, and the stockholders meeting once a year for six years to receive and act upon reports of its officers for the preceding year, and not a hint from the evidence that the loan of the bonds by the company was ever disapproved. The truth is, as we gather from the record, that the Liberty bonds of the B–B Company were idle in its vaults, and its board of directors and stockholders were perfectly willing and satisfied for the loanee to have them and to pledge them to the state for deposits of public funds, so long as the loanee was enjoying fair weather and smooth financial sailing, but, when the latter was engulfed and wrecked in a sea of frozen and worthless securities, the loaners wanted the bonds returned free from the burden that had been placed against them. In other words, when the loanee became insolvent and unable to redeem the bonds from the pledge or pay the loaner their value, the latter asked for their return or their value, with the resultant loss falling on the general depositors of the insolvent or upon the state.

That being the true situation, it would be highly inequitable even though the state treasurer knew such bonds belonged to the B–B Company, to permit it or its stockholders to repudiate their action and recover the bonds from the state treasurer or to be given a preference over the general creditors.

While the stockholders as such are not agents of the corporation and cannot sell or dispose of its property, they are the equitable owners of its assets, and, when they stand by or actively encourage the officers they have selected to act for them to dispose of or handle the corporation's property in a way not permitted under its charter, and thereafter say nothing and do nothing over a long period of time, thereby tacitly ratifying and acquiescing in what was done, they should not be permitted to assert that the action of the directors was *ultra vires* and void. *Aransas Pass Harbor Co.* v. *Manning,* 94 Tex. 558, 63 S. W. 627; *Martin* v. *Niagara Falls Paper Mfg. Co.,* 122 N. Y. 165, 25 N. E. 303; *Kent* v. *Quicksilver Mining Co.,* 78 N. Y. 159; 14 C. J. 59, § 20.

In *Kent* v. *Quicksilver Mining Co., supra* (reading at page 185 of 78 N. Y.), the court announced this very sound rule:

"In the application of the doctrine of *ultra vires,* it is to be borne in mind that it has two phases: one where the public is concerned; one where the question is between the corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them. When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail. When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent or his intelligent though tacit consent to the corporate action. If there be a

departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or are *malum prohibitum*. Then no assent of stockholders can validate them. It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will be protected in a reliance upon those acts."

The rule adhered to by the federal courts is called to our attention and urged as the proper rule on the question of *ultra vires*. *Central Transportation Co.* v. *Pullman's Palace-Car Co.*, 139 U. S. 24, 35 L. Ed. 55, 11 Sup. Ct. Rep. 478. It is said that, under that rule, even though the stockholders subsequently ratified the loan of the Liberty bonds or consented thereto, the B–B Company would not be estopped. This is not the rule generally adopted in the state courts. It is not the rule in this state. *Leon* v. *Citizens' Bldg. & Loan Assn.*, 14 Ariz. 294, Ann. Cas. 1914D 1151, 127 Pac. 721; *Arizona Corporation Com.* v. *California Ins. Co.*, 28 Ariz. 128, 236 Pac. 460.

The Liberty bonds here involved are commercial paper, and would pass from hand to hand much the same as currency. They are made payable to bearer, and are negotiable by delivery. *Pennington* v. *Farmers' & Merchants' Bank*, 144 Tenn. 188, 17 A. L. R. 1213, 231 S. W. 545; *Bank of Monango* v. *Ellendale Nat. Bank*, 52 N. D. 8, 40 A. L. R. 889, 201 N. W. 839. We think there can be no question but that the state treasurer took the Liberty bonds in good faith, and that the deposit by him of public moneys equal to their face was giving value for them. If, therefore, the treasurer did not know that the

bonds belonged to the B–B Company, the state was the holder of such Liberty bonds in due course. Paragraph 4197, Civ. Code 1913 (Negotiable Instruments Law).

The court found as a fact that the state had no notice of any defect or infirmity in the title of the insolvent bank to said bonds or any of them. This finding is challenged because it is said it is indubitably shown that the superintendent of state banks knew the bonds were loaned by the B–B Company to the insolvent bank and that the latter did not own them. Conceding that notice to the superintendent of banks of the loan of bonds was notice to every officer of the state, it may be seriously questioned as to whether such notice would suggest an infirmity in the title of the bank in view of the negotiable character of the bonds. But, was notice to the superintendent of banks notice to the state, especially when the transaction concerned duties not at all pertaining to him or his office? Within the line of his duties, when acting honestly and faithfully, it is entirely reasonable to say notice to the superintendent of state banks is notice to the state, but, when the act concerns the duties of another agent of the state, a very different question arises. It is made a misdemeanor for the superintendent of banks or any person connected with his office to disclose any information obtained in the discharge of his official duties, except to federal, state or clearing-house bank examiners, or officers legally empowered to investigate criminal charges, or except as otherwise provided by law. Section 6, chap. 31, Laws 1922. The information the superintendent of banks had concerning these Liberty bonds was obtained by him in his official capacity, and the state treasurer is not one of the officers to whom he is permitted to give such information, and he is not by any other provision of law authorized to disclose

it to the state treasurer. The state treasurer is the agent through whom the state acts when it accepts securities other than personal or surety bonds as protection to deposits of public funds. If what is claimed as a defect in the bank's title to the bonds was in fact a defect, actual notice thereof to the state treasurer certainly would be necessary to bind the state. It must be remembered that Liberty bonds have no earmarks; that they are made payable to bearer, and the person in possession thereof is the apparent owner, with full power and authority to dispose of them very much as he would pass money. We are convinced that the state is the holder of said $12,500 worth of Liberty bonds in due course.

The B–B Company is not entitled to a preferred lien on the assets of the bank for the value of the Liberty bonds. The bank did not convert such bonds into money and thereby swell its assets. The receiver did not take over the bonds or their converted value. The state treasurer, who, as we have seen, was a holder thereof for value, sold the bonds and applied the proceeds upon the insolvent's defalcation to the state. The Liberty bonds were put up in lieu of personal or surety bonds and to serve the same purpose, that is, to protect the state's deposits of public moneys and to make good any loss by reason of such deposits. Whatever was received was used to repay the state for public moneys it had from time to time deposited with the insolvent. The equitable doctrine that gives under certain circumstances the owner of property a preferred lien against the assets of an insolvent, when it augments such assets and can be traced and identified, has no place here, because neither the bonds nor their proceeds ever reached the receiver. For a further discussion of this proposition see below.

The legal situation of the savings bank case differs from the B–B Company case, in that the stockholders thereof, or many of them, the plaintiff Boville among others, did not know that the $83,700 in bonds had been loaned to the bank, and did not consent thereto nor ratify such loan, and as to such estoppel could not be claimed. They are therefore within their legal rights when they claim a preference in favor of the savings bank. The officers of the latter violated their trust when they turned over to the insolvent bank the Liberty bonds of the savings bank for the purpose of permitting them to be used as collateral security to deposits of public moneys in such bank. The act of the insolvent bank, whose directors were also largely the directors of the savings bank, in accepting and hypothecating the bonds to the county, was one of bad faith and a breach of trust. The county, as shown by the evidence and findings, was a holder in due course. It was doubtless the duty of the receiver, if among the assets turned over to him he received the substituted value of the bonds and could identify it, to take therefrom an amount sufficient to redeem bonds and return them to the rightful owner, the savings bank, and not having done so the funds in his hands should be impressed with a trust in favor of the savings bank. But, if there never came into his hands such substituted value there is no legal theory upon which such trust could be declared. The equitable action to impress a trust is against the specific property or its substituted value, and it is a cardinal principle that these must be located and identified and must augment the estate of the wrongdoer before the preferred lien can be declared.

*Dudley* v. *Richards,* (C. C. A.) 18 Fed. (2d) 876, 878, was in all essential facts like this one. Richards had left with the Farmers' National Bank of Burlington, Kansas, $7,000 in Liberty bonds for safe-

keeping. The bank delivered such bonds to the state treasurer of the state of Kansas to secure deposits made in said bank by such officer, who later sold the bonds to cover deposits, the bank having failed. Under such facts the owner of the bonds sought to have impressed a trust in his favor upon the general assets of the insolvent bank. The court, after stating the rule to be that clear proof must be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came into the hands of the receiver before a preference could be declared in favor of the *cestui que trust,* said:

"It will be noted that no money, as the proceeds of these bonds, came into the hands of the bank prior to the receivership. It is true that the bonds themselves were received by the bank, and by it delivered to the state treasurer, as security for the general deposits made by that state officer; thus they were converted, but the funds of the bank were not thereby augmented. The theory of augmentation is apparently based upon the fact that the indebtedness of the bank to the state as its depositor was discharged by the proceeds of sale of these and other bonds delivered as security for such deposit. Upon this point, Judge SANBORN, speaking for this court in *Farmers' National Bank* v. *Pribble, supra* [15 Fed. (2d) 175], says:

"'The fact that the claimant's property paid or reduced the indebtedness or liability of the insolvent corporation, so that it will pay a larger percentage of its debts, justifies no lien on its assets by or preference in payment to the *cestui que trust* (1) because such a reduction of indebtedness does not increase the property or the value of the property of the insolvent; and (2) because the property of the claimant so used to pay a part of the insolvent's general indebtedness or liability never goes into, and therefore cannot be traced into, the property or assets of the insolvent which subsequently come into the possession of the receiver.'"

In *Lomax* v. *Linn County Bank,* (Mo. App.) 1 S. W. (2d) 206, 209, it appeared that the bank, through its president, Lomax, had wrongfully and tortiously deposited with the Treasurer of the United States Liberty bonds belonging to Minnie Stambach to secure postal savings then being deposited with the bank. The bank failed, and the Treasury Department sold the Liberty bonds. The Liberty bonds were worth $4,850, and the postal savings deposit was for $2,912.92. The Department, after deducting the indebtedness, remitted the balance of $1,920.46 to the finance commissioner of banks. The court allowed the *cestui que trust's* preferred claim for the latter amount because it was traced into the hands of the finance commissioner, but, as to the item of $2,912.92 retained by the government, it was said:

"The rule that where the trustee mingles the trust money with his own there is a legal presumption that the partial withdrawal of the fund by him was from his own money and the balance remaining included the trust fund, has no application here because the trust property has been traced and it is shown that it has been dissipated to the extent of $2,912.92, and that the estate now in the hands of the finance commissioner has not been swelled to that extent by this dissipation. Of course, when the bank received these bonds its assets in a sense were swelled to the amount of the bonds but that is not what is meant when the question of augmentation of assets arises. The assets must have been increased in the hands of the commissioner of finance."

In *Leach* v. *Carper,* 202 Iowa 859, 51 A. L. R. 910, 211 N. W. 532, 534, the facts were that the Farmers' & Merchants' Savings Bank of Mt. Pleasant, Iowa, had on deposit for safekeeping Liberty bonds in the sum of $86,550. When the bank failed, it had on hand $55,450 of such bonds, which were turned over to the superintendent of banks, but the balance of $31,100 of such bonds was then held by the Chase

National Bank of New York as collateral to a loan to the insolvent bank. The insolvent bank's use of such bonds was tortious. The court held that the bonds turned over to the receiver should be apportioned to the bond owners, but as to those in the possession of the Chase National Bank it was said:

"There is nothing, therefore, in the record, tending in any way to show that anything received from either bank on the credit of the bonds was ever in the possession of the insolvent, or that the assets of the bank were augmented thereby in the hands of the receiver. Upon no theory, therefore, are claimants entitled to a preference of their claims for the bonds not in the actual possession of the receiver."

For cases involving the misappropriation of Liberty bonds and the owners' rights, see note to this case at 51 A. L. R. 914. See, also, *Leach* v. *Burton & Co. State Bank,* 206 Iowa 675, 220 N. W. 113.

The plaintiffs, however, contend that under a similar state of facts in *Commissioner of Banks* v. *Cosmopolitan Trust Co.,* 240 Mass. 254, 133 N. E. 630, 632, the court granted the relief here sought. The facts were that the Cosmopolitan Trust Company conducted a general banking business and maintained a savings department. The officers of the company borrowed a large sum of money, using as collateral mortgages and other securities belonging to the savings department and used the proceeds wholly in the commercial department. When the commissioner of banks discovered the condition of affairs, he petitioned the court for instructions as to his duty in the premises. The court decided that it was the duty of the commissioner under the circumstances to pay off the loan and replace the securities in the savings department, or, if securities had been sold, to restore the equivalent in money from the assets of the commercial department. The court, after making

some observations as to the law and facts, ended its opinion with this sentence: ''The duty of the plaintiff rests upon the provisions of the Banking Law.'' There the ultimate right was between the special and general depositors of the same institution, and it seems the local law governed.

Another case relied upon by plaintiffs is *Andrew* v. *Citizens' State Bank,* 203 Iowa 345, 51 A. L. R. 906, 212 N. W. 745, 746, but in that case all of the Liberty bonds came into the hands of the receiver of the bank on his taking possession of its assets or during the period of liquidation. This excerpt from the opinion shows how different the situation there was from the present one:

''The instant claimants had the right to demand the return of these bonds, and in the event the receiver has sold same, to receive the proceeds. It was sufficient on the part of the claimants to show that these bonds came into the possession or control of the receiver, and it is clear from the record that these bonds were in his possession and under his control. By the return thereof or of the proceeds, it may not be said that the rights of the creditors were impaired.''

In this case counsel emphasize the fact that $7,000 of such Liberty bonds, together with other securities, were at the time of the receivership held by the Northern Trust Company as collateral to a note of the Citizens' State Bank for approximately $10,000, but the evidence quite conclusively shows that said note was satisfied and paid off out of collateral other than the Liberty bonds, and the latter were thereupon turned over to the receiver. If the county had satisfied its demand against the insolvent bank out of other securities, the Liberty bonds belonging to the Savings bank and held by it as security would have naturally gone to the receiver subject to the same disposition as in the Andrew case, *supra,* and the

same may be said of the Liberty bonds belonging to the B–B Company.

Counsel also cite and rely upon two cases from our own court. *Pinal County* v. *Hammons,* 30 Ariz. 36, 243 Pac. 919, and *Jarvis* v. *Hammons,* 32 Ariz. 444, 259 Pac. 886. If the proceeds of the Liberty bonds belonging to the plaintiff had been received by the superintendent of banks, then, on the proposition of tracing and identifying them these cases would be in point; but, as we have seen, neither the bonds nor their substituted values have been traced into his hands and they have not augmented the estate of the insolvent.

We should state that at the time of the bank's insolvency it had cash, which passed into the hands of the receiver, as follows: In its vaults, $64,264.70; cash in correspondent banks, $159,855; cash items and cash in transit, $14,839. There is no finding or proof that this cash on hand, or any part of it, was made up of the deposits of the county or state moneys. It would be as reasonable to assume that it was made up wholly of deposits of the general customers of the bank. If, however, it were identified as public moneys, no preference would follow. The state and county have no preference under the law. The relation they bore to the depository bank was that of creditor and debtor and upon the bank's insolvency their right to share in its assets ranked no higher than the general creditors. *In re Central Bank of Wilcox,* 23 Ariz. 574, 205 Pac. 915. Upon the doctrine of subrogation, if it were applicable, the plaintiffs could not claim a preferred lien on the assets because the county and the state could not.

We have carefully considered all of the assignments made by plaintiffs, and are satisfied the trial court's disposition of the cases was in accordance with well-established principles of equity. All persons who have, acting in person or by agent, through

faith in another, entrusted him with property, must upon his insolvency and inability to return such property or its equivalent suffer alike; the exception being those who have not parted with the title to property and who are able to trace and identify it or its substituted value. Any different rule might often result in funds properly belonging to the general creditors innocent and confiding also, being taken to pay the losses of *cestuis que trustent,* even though it clearly appear that such losses had been wholly dissipated or frittered away by the trustees.

The judgments of the lower court are affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.