[Civil No. 2606. Filed October 10, 1927.]

[259 Pac. 886.]

GEORGE JARVIS, Treasurer of the County of Apache, State of Arizona, Who Sues for the Use and Benefit of the County of Apache, State of Arizona, Appellant, v. A. T. HAMMONS, State Superintendent of Banks, Acting as Receiver of the Bank of Winslow, of Winslow, Arizona, an Insolvent Banking Corporation, Appellee.

Mr. Levi S. Udall, County Attorney, and Mr. Maurice Barth, and Mr. Isaac Barth, Special Counsel, for Appellant.

Mr. John A. Ellis, and Messrs. Sapp & McLaughlin, for Appellee.

ROSS, C. J.—This action is brought here on appeal from the superior court of Yavapai county, wherein the appellant, Jarvis, as plaintiff, sued as treasurer of Apache county for the use and benefit of Apache county, the appellee, A. T. Hammons, state superintendent of banks, acting as receiver of the Bank of Winslow as defendant, and wherein Benjamin Brown, Jr., filed, with leave of court a complaint in intervention.

In 1923 and 1924 Benjamin Brown, Jr., was county treasurer of Apache county. The Bank of Winslow during those two years was a designated depository of Apache county regularly qualified to accept deposits of public money of the county up to the sum of $30,000, it having furnished surety bonds to that amount. The bank also placed with the treasurer of Apache county, as security for any additional deposits (over and above the $30,000) that the treasurer might make, warrants of Apache county in the sum of

$15,434.10, and of Navajo county in the sum of $8,110.38, totaling, with the $30,000 surety bonds, $53,544.48. The bank became insolvent on October 3, 1924, and on the 4th passed into the hands of A. T. Hammons, superintendent of banks, who later was appointed the receiver of such bank. At such time the state of the account between the bank and Apache county was as follows:

The bank had on deposit public moneys of the county in active account $12,599.92, and in inactive account $33,000, or a total of $45,599.93. Two transactions between the bank and Treasurer Brown on and after October 1st and before October 4th very materially affected this balance. On October 1st Brown wanted to transmit to the Continental & Commercial National Bank, of Chicago, for the purpose of paying certain bonds of Apache county then due, the sum of $23,023, and the method he pursued to accomplish this purpose was this: He drew two checks, one against the Bank of Winslow for $11,511.50 and one against the Round Valley Bank of Springerville (also a depository of Apache county) for the same amount, and handed these two checks to the cashier of the Bank of Winslow, and in exchange therefor received a draft upon the National City Bank of New York for $23,023, the Bank of Winslow at the time crediting itself with the check drawn against it and charging the county with the same amount. If this draft had been paid, the county's balance in the Winslow bank would have been reduced $11,511.50, but it was not paid because the drawer had not funds sufficient in the drawee bank to meet it. The result of the transaction was that the Bank of Winslow did not part with any of Apache county's funds on deposit with it, but did obtain from Apache county the additional sum of $11,511.50 as represented by the check on the Round Valley Bank.

Treasurer Brown, having theretofore deposited $75,000 of the moneys of Apache county in the Denver National Bank of Denver, Colorado, on October 3d deposited two certificates of deposit for $5,000 each, issued by such bank to Apache county, in the Bank of Winslow. Therefore, when the Bank of Winslow was taken over by the superintendent of banks on October 4th it owed Apache county the following sums: Active and inactive accounts, $45,599.93; Round Valley check, $11,511.50; Denver certificates, $10,000; or a total of $67,111.43.

As an offset to this amount the Bank of Winslow and the receiver, Hammons, are admittedly entitled to the following credits: Deposits equal to the bank's surety bonds of $30,000; Apache and Navajo county warrants, $23,544.48; or a total credit of $53,544.48.

Deducting the credits from the debits it leaves a balance due Apache county of $13,566.95, and interest thereon, or a total of $16,121.54.

This suit was brought in behalf of Apache county for the purpose of establishing a preferred lien upon the funds in the hands of the receiver in its favor; and the treasurer of Apache county (Benjamin Brown, Jr.), having theretofore been sued individually and upon his surety bonds by Apache county for such balance, and judgment having been obtained against him for such balance, was permitted to intervene, and in his petition of intervention he also asks for a preferred claim upon said funds.

The judgment denied the prayers of both Apache county and the intervener, Brown, and they have prosecuted from such judgment separate appeals.

It is the contention of the appellant, Jarvis, representing Apache county, that the intervener was improperly permitted to intervene. The money sued for unquestionably was public moneys of Apache county, and Apache county is entitled to recover it from the receiver of the depository bank, or from

Brown, the officer who deposited it in such bank. The county is not entitled to be paid the debt twice. It has recovered judgment for such balance against Brown and his sureties. This judgment has not been paid, but is on appeal to this court. In the event such judgment should be affirmed, Brown would be entitled to a credit thereon of any amount recovered by the county in this suit. He is not entitled to that at this stage of the proceeding, and, if the county's contention should be sustained and it given a preferred lien upon the funds in the hands of the receiver, there would be no occasion for the intervener's claim, even if tenable. So, we take it that the purpose of this lawsuit will be fully accomplished if we determine the rights of Apache county as presented by this appeal, the intervener's rights being wholly dependent thereon.

There is no disputed question of fact, all the controversy being as to the legal effect that should be ascribed to the facts. We are concerned with the legal aspect of the case, and not the facts.

It is the contention of counsel for the county that all the moneys of the county that found their way into the Bank of Winslow, whether by deposit or otherwise, over and above $30,000, that being the amount of the depository bond furnished, were wrongfully and unlawfully placed in such bank, and that, even though Brown took from the bank as security for additional deposits county warrants to the extent of $23,544.48, the public moneys placed in the bank against such security were unauthorized by law and therefore unlawfully and wrongfully deposited.

It seems to us that these contentions must be sustained. The statutes provide for public depositories and authorize county treasurers to place in them the public moneys, but before any public moneys may be deposited or placed in any depository it must execute a bond to the county in a sum equal to the proposed

deposit, conditioned that such depository will promptly pay to the parties entitled thereto all public moneys in its hands upon lawful demand therefor, and such bond must be approved by the board of supervisors of the county. Par. 4642 et seq., Civ. Code 1913. In lieu of such bond the county treasurer is authorized to accept, as security for deposits of public money "interest-bearing bonds of the United States, or of this state, or any county, city, road district, or school district of this state at par." Paragraph 4648, Id.

The Bank of Winslow under the facts was qualified to accept deposits of the county's moneys up to but not in excess of $30,000, and the treasurer could lawfully place in such bank that sum and no more. The county warrants of Apache and Navajo counties left with the county treasurer as security for public moneys of the county were not of the kind of securities enumerated by the statute that might be used in lieu of personal sureties or a surety company bond. The county treasurer had no authority to accept such warrants and make deposits of public moneys against them. If he could disregard the statute and accept county warrants as security for deposits, he could accept any other kind of securities. He had no right to disregard the terms of the statute, for if he could accept any other security than that enumerated in the statute we see no reason why he could not take as security any commercial paper, including stocks of oil and mining companies. The fact that in this case the securities taken by the county treasurer happened to be good does not change the rule.

The legislature has very carefully tried to guard the public moneys of the state and county against loss by reason of the indiscretion, carelessness, ignorance or dishonesty of officials charged with the receipt, safe-keeping, transfer or disbursement of such public moneys. In the chapter of the Civil Code

treating of the duties of county treasurers (paragraph 2584) is found the following prohibitions and restrictions in handling public moneys:

"The county treasurer must keep all moneys belonging to this state, or to any county of this state, in his own possession until disbursed according to law. He must not place the same in the possession of any person to be used for any purpose; nor must he lend, or in any manner use or permit any person to use the same except as provided for by the laws relating to deposit of public money in banks and banking institutions, and as otherwise provided by law."

That the intervener, Brown, violated the terms of this statute in parting with the possession and control of some thirty-seven thousand dollars of the county's money, and in transferring such possession and control to the Bank of Winslow, is manifest. The Penal Code is equally as explicit in its restrictions and prohibitions. Section 439.

Considerable stress is placed upon the transaction in which the intervener undertook to transmit, or cause to be transmitted, $23,023 to Chicago to pay off some overdue bonded indebtedness of Apache county. It is contended by the intervener that such transaction was nothing more or less than a selection by him of the Bank of Winslow as his agent to take from him such money and forward it to the Continental & Commercial Bank of Chicago, thus creating the relation of trustee and *cestui que trust*, whereas, appellee contends it was the purchase of exchange establishing the relation of debtor and creditor between the Bank of Winslow and the intervener; and the county contends it was a deposit and as such wrongful and unlawful. Whichever it was, we think, is immaterial, since if the Bank of Winslow had put up sufficient legal security to cover the transaction no loss to the county could have resulted.

Instead of seeking exchange to send to Chicago, the easy, simple and natural thing to have done was for the county treasurer to send his official check or checks, drawn on county depositories, for such amount.

We think the purpose and intent of the statute prescribing the duties of treasurers in handling public moneys was to have such treasurers keep the public moneys in their possession, or in the possession of a legal depository of the county with ample security, and that such purpose and intent can be violated by giving over the public moneys to unbonded banks simply for transmission or by purchasing exchange therefrom, as well as by making a deposit in any such unbonded bank.

In *Pinal County* v. *Hammons,* 30 Ariz. 36, 243 Pac. 919, it appeared that the county assessor of Pinal county had deposited with the Pinal Bank & Trust Company certain of the county's moneys without authority of law, and, the bank becoming insolvent, the question was whether the county was entitled to a preferred lien against the assets of the bank in the hands of the superintendent of banks. After discussing the cases and the statutory law, we said:

"Since the title to the moneys deposited with the bank did not pass and the relation of creditor and debtor did not arise, it follows that the bank took possession thereof as a trustee in favor of the true owner, and the superintendent of banks is affected by the same trust and is in duty legally bound to account therefor to the *cestui que trust.*"

That case seems decisively to hold that a county, where its public moneys are wrongfully or unlawfully placed in the possession of a bank or banking institution, does not lose title thereto, and that the bank is a trustee *ex maleficio* of such moneys for the use and benefit of the county. We are satisfied with the view therein expressed.

But it is contended by appellee, receiver, that the trust fund was commingled with the general funds of the bank, and that it has not been sufficiently traced and identified to authorize a court of equity to enforce thereon a preferred lien. It appears that all of the public moneys of the county that reached the insolvent bank, over and above the amount for which it was bonded, were wrongfully and unlawfully placed therein, and that such excess amounted to $37,000 plus. All of this sum, according to the record, was money or the equivalent of money and was so carried upon the books of the bank, except the items represented by the Round Valley Bank check for $11,511.50 and the two Denver certificates for $10,000 or a total of $21,511.50. Instead of itself collecting these two items, the Bank of Winslow forwarded them to the First National Bank of Albuquerque for collection and credit, and none of the proceeds thereof ever reached the Bank of Winslow or the receiver except as herein explained.

On October 4th, the date appellee took possession of the insolvent's estate, there was a credit in its favor in the Albuquerque bank of some $47,000, made up in part by the Round Valley check and Denver certificates. The Bank of Winslow as against said credit owed the Albuquerque bank a large sum of money, and in the settlement of their mutual obligations the Albuquerque bank kept the $47,000 due the Winslow bank and surrendered to the receiver some $75,000 of commercial paper, held by it as collateral to the indebtedness owed to it by the Winslow bank. This collateral, it is shown, has been collected by the receiver up to $50,000. Thus it appears that Apache county's money was used by the receiver to pay off, or to help pay off, a charge against paper out of which he realized for the general creditors of the insolvent bank a very handsome sum.

That part of the trust fund not represented by the Round Valley check and Denver certificates coming to the trustee in cash, or its equivalent, was sufficiently traced and identified, under the rule stated in the Pinal County case, *supra*, when it was shown it was commingled with the general funds of the bank and augmented its assets. In that case we said:

"It is shown by the record that the deposit consisted of money and paper representing money, such as checks and drafts, which were converted into money by the bank, and that it was all mingled with the other funds of the institution and enhanced its apparent assets. This, we think, is sufficient identification. It is not necessary that the identical money, checks, or drafts deposited be in the hands of the trustee; it being sufficient if it be shown that their substituted value was commingled with and augmented the assets of the insolvent."

We think it is well settled that if a trustee takes a trust fund and wrongfully invests it, the substituted property is impressed with a trust in favor of the *cestui que trust* so long as it can be traced. The Round Valley Bank check and the Denver certificates entered into the $75,000 of collateral redeemed by the receiver from the Albuquerque bank, and out of these collaterals $50,000 have been traced into the receiver's hands. True, the cash paid by the receiver for such collaterals was more than the $21,511.50 of the county's moneys, and how much more we cannot definitely say from the record. It does appear that the $21,511.50 constituted a large part of the consideration, probably forty per cent. Figuring it at twenty-five per cent, the county's preferred lien would attach to one-fourth of $50,000 realized, or $12,500, which, added to some $16,000 of the county's moneys that were deposited as cash or the equivalent of cash and commingled with the general assets, would make $28,500 of trust funds in the

receiver's hands sufficiently traced and identified for the purpose of enforcing a preferred lien.

We quote from appellee's brief what we believe to be the correct rule to be applied in determining whether a preferred lien against the estate of an insolvent should be allowed:

"The right to recover a trust fund in full from the assignee or receiver of an insolvent debtor depends upon several things, the three principal ones being: First, the establishment of the fact that the deposit of the money with the debtor was made under circumstances creating a trust; second, an affirmative showing that by reason of the transaction the actual, physical assets coming into the hands of the receiver or assignee were augmented by the transaction; and third, the ability of the claimant to trace his deposit, either in its original form or in a changed form, into the hand of the receiver.

"If the deposit is cash and the cash is, by the debtor, commingled with other cash belonging to the debtor and the commingled funds do not, subsequent to the deposit, decrease below the amount of deposit, it will be presumed that the cash remaining in the commingled fund is that of *cestui que trust* for the reason it will be presumed that the debtor, now insolvent, in paying out moneys, paid out his own rather than that of the *cestui que trust.*"

We submit that all three of the essentials enumerated are present in this case, and that Apache county was entitled to a preferred lien.

The amount of cash on hand when the bank closed was $27,134, and to that should be added the $12,500 realized out of the collateral saved to the insolvent's estate by the purchase of such collateral with the proceeds of the Round Valley check and the Denver certificates, making $39,634 subject to the preferred lien.

The judgment is reversed and the cause remanded, with directions that the lower court enter judgment as prayed for in plaintiff's complaint.

We desire to say the record fully exonerates Treasurer Brown from any intentional wrong and shows him to be scrupulously honest.

LOCKWOOD and McALISTER, JJ., concur.