STATE ET AL. *v.* CARSON VALLEY BANK ET AL.
STATE ET AL. *v.* UNITED NEVADA BANK ET AL.

Nos. 3105, 3106

July 10, 1935.                                    47 P. (2d) 384.

*Gray Mashburn,* Attorney - General, and *George L. Sanford,* for Appellants:

*Platt & Sinai,* for Respondents:

# OPINION

By the Court, LOCKHART, District Judge:

This is an appeal from a decree in two cases brought in the First judicial district court of the State of Nevada, in and for the county of Ormsby, one case being State of Nevada and George B. Russell, as state treasurer of the State of Nevada, plaintiffs, against Carson Valley bank, a Nevada banking corporation, and E. J. Seaborn, as superintendent of banks of the State of Nevada, and J. H. Stern, S. C. Durkee, and S. C. Bigelow, for themselves and other depositors in said bank similarly situated, defendants, the other case being the same plaintiffs against United Nevada bank, a Nevada banking corporation, and E. J. Seaborn, as superintendent of banks of the State of Nevada, and John Granata and Robert M. Price, for themselves and all other depositors in said bank similarly situated, defendants; thereafter in both actions Leo F. Schmitt, as receiver of each of said banks, was substituted as successor to the defendants.

These actions were joined upon the trial and by and through stipulation were also joined upon the appeal.

Upon the oral argument in this court, the appellants expressly disclaimed any right of preference for these amounts or either of them by reason of the sovereign right of the State of Nevada to claim such preference right, but contends that the $65,000 is entitled to preference as special and / or specific deposits, and the $119,747.64 as a trust fund and entitled to preference.

All these funds were moneys collected by the Nevada industrial commission in the course of its activities as such under the laws of this state known as the Nevada industrial insurance act and belonged to what, under the law, is known as state insurance fund.

We first consider the deposits amounting to $65,000 and later will consider the other deposits of $119,747.64.

Four deposits of various amounts aggregating $55,000 had been made by the state treasurer of Nevada in the Carson Valley bank upon what were called, one "a special deposit," and three "special deposits" all bearing interest at 3 percent per annum. As each of these deposits were made, county and municipal bonds of certain taxing units of Nevada were deposited by the Carson Valley bank with the state treasurer as security for the return and repayment of such deposits to the state treasurer, the first one at the end of a period of six months, the other three upon written demand.

All these deposits were made pursuant to an order of the Nevada industrial commission and pursuant to section 40 of the Nevada industrial insurance act (Stats. 1913, c. 111, sec. 40, as amended by Stats. 1915, c. 190, sec. 12), except that whereas said section 40 required "a good and sufficient surety deposit bond," the county and municipal bonds were deposited with the state treasurer instead; at a later date and subsequent to all these deposits, "surety deposit bonds" were furnished by the bank to the state treasurer and the said county and municipal bonds were returned to the bank.

The bank closed its doors, finally landed in the hands of receiver Schmitt, the present defendant herein, and

the surety bond or bonds given are worthless on account of the insolvency of the surety company.

As to the United Nevada bank transaction, the state treasurer deposited $10,000 as a "special time deposit" for the period of one year or until demand is made therefor, under an order of the Nevada industrial commission based upon the bank giving a surety bond of the Nevada Surety & Bonding Company and pursuant to said section 40 of the insurance act, as amended by Stats. 1919, c. 176, sec. 7. The bank was to pay 4 percent per annum upon this deposit. At the time of this deposit, a written agreement was entered into between the bank and the Nevada industrial commission in which this deposit was designated a "time loan for the period of one year from date, or at any date thereafter on demand of the Nevada industrial commission."

The Nevada Surety & Bonding Company giving the above bond is now insolvent, and the bank is now in the hands of the defendant receiver.

All these deposits stand on the same footing and will be all treated together.

Interest was paid upon these deposits as stipulated at each interest payment date until the banks were closed.

Demand has been made upon the banks since they have been in the hands of the superintendent of banks and the receiver for the return of all said funds so deposited and that each of said deposits be treated and held to be special deposits to be paid in full, but they have been denied as special deposits and accorded only the status of general deposits.

Suits were brought in the proper district court to have these deposits declared special deposits and entitled to preference and paid in full. Decree was for the defendant, and from this decree, this appeal was taken.

If the contention of plaintiffs is right, the entire sums deposited become preferred claims with preference over all general claims and entitled to first payment from the assets of the banks.

There are but two kinds of bank deposits, special and

general. A special deposit is one in which funds are deposited for a special purpose and the identical funds returned to the depositor or paid to other particular persons designated by the depositor and the relation of bailee and bailor arises between the bank and the depositor and not the relation of debtor and creditor; all other deposits are general and between the bank and its depositor the relation of debtor and creditor exists with no preference of payment to the creditor.

These deposits were made many years ago, those in the Carson Valley bank being made in July, 1915; August, 1916; July, 1917; and August, 1917, and that in the United Nevada bank in June, 1930.

The Carson Valley bank deposits draw interest at 3 percent per annum and the United Nevada bank deposits draw interest at 4 percent per annum.

There is no contention and no question raised that any of these deposits were illegal or unauthorized, and they appear to have been made in accordance with the law in force and effect at that time, the question being, Were they special deposits as designated in the certificates of deposit issued by the banks at the time the deposits were made?

Section 8 of the Nevada industrial insurance act, as amended by Stats. 1915, c. 190, sec. 3, provides that on and after April 1, 1915, the administration of the act was imposed upon the Nevada industrial commission, consisting of three members appointed by the industrial commission board, which is and was composed as follows: The governor, attorney-general, and inspector of mines.

Section 40½ of that act, as added by Stats. 1917, c. 233, sec. 10, makes it the duty of the industrial commission board to make an audit of all books of account and records and of the funds of the Nevada industrial commission annually or as often as they may deem necessary.

This court will take judicial notice that since at least the deposits were made in the Carson Valley

bank, the state treasurer, the governor, and the personnel of the Nevada industrial commission and the industrial commission board have from time to time been changed and others have taken the place of those retiring.

These deposits, however, have remained unchanged and the interest thereon as designated in the certificates of deposit has been paid to and received by the state insurance fund officers having the care and custody of that fund.

The state can only act through its duly elected and appointed officers and their actions when authorized by law constitute the actions of the state. Those officers know and must be charged with the knowledge of these deposits as in the performance of their duties they must have investigated where the state funds were kept and secured.

The Carson Valley bank deposits of the funds in question were first secured by bonds and later they were withdrawn and surety bonds given in lieu thereof.

Banks may give security for deposits only when by law they are expressly permitted to do so and at the present time national banks can only give security for deposits in those states whose laws permit state banks to do so.

The laws of Nevada require all banks, both state and national, to give security for all state and all such public deposits.

This security is not that the identical money shall be returned when it shall be demanded, but that repayment shall be made upon demand and without loss to the state or other public depositors.

The law requires that interest shall be paid on such deposits and it is not to be conceived that the law would require the payment of interest upon dead funds lying idle year after year in the bank with no chance for the bank to make an investment sufficient to earn such interest. The security is to guard against bad investments which may endanger the safety of the deposit.

It always has been the policy of governments to keep money in circulation rather than to have it hoarded and kept out of circulation.

The contention is made that these deposits were made for a special purpose, the payment of claims of those injured in the industrial pursuits of the state. That is true in that all funds belong to the state insurance fund created and are collected for that purpose.

All these deposits, with the single exception of the United Nevada bank deposit, were made under the 1915 session amendment, chapter 190, section 40, subsection (c), which reads as follows: "The state treasurer may, upon written authority of the Nevada industrial commission, approved by the governor, deposit an additional fifteen per cent of said fund in bank or banks in the State of Nevada upon special time deposits bearing interest at not less than three per cent per annum; provided, however, that such bank or banks in which deposits may be made shall give to the Nevada industrial commission a good and sufficient surety deposit bond guaranteeing said Nevada industrial commission against any loss of said deposit by reason of failure, suspension, or otherwise of said bank. Interest earned by such portion of the state insurance fund which may be deposited in any bank or banks, as herein provided, shall be placed to the credit of the state insurance fund."

Before this amendment, section 40 read as follows: "The State of Nevada shall not be liable for the payment of any compensation under this act, save and except from the said state insurance fund, to be derived from the payment of premiums as provided in this act." Laws 1913, c. 111.

Section 24 of that act is as follows: "All premiums provided for in this act shall be paid to the state treasurer, and shall constitute the state insurance fund for the benefit of employees of employers and for the benefit of dependents of such employees, and shall be disbursed as hereinafter provided."

The first attempt of the legislature of Nevada to enact

a workmen's compensation law was the act of March 24, 1911, page 362 (chapter 183), which was very brief and provided for arbitration of claims for injuries when the parties interested were unable to agree.

In 1913 this act was repealed and the original act which we now have was enacted, and was approved March 15, 1913, page 137 (chapter 111).

Section 24 of that act remains today as then enacted and as quoted above.

The case State v. McMillan, 36 Nev. 383, 384, 136 P. 108, held the state insurance fund was a special fund given to the state treasurer in trust as distinguished from state taxes and other revenues of the state.

The legislature by the "Nevada Industrial Insurance Act" has seen fit and proper to direct how the state insurance fund shall be safeguarded and protected and has provided, as we see in section 40, as amended and set forth as above, to provide for a portion of that fund to be deposited in bank or banks.

The only security required is that the bank receiving such a deposit shall furnish a "good and sufficient surety deposit bond guaranteeing said Nevada industrial commission against any loss of said deposit by reason of failure, suspension, or otherwise of said bank."

No further requirement was provided for, no provision that the bank should hold it as a trust fund, no provision that it should be a preferred claim on the assets of the bank, nothing to indicate that the state would exercise a "sovereign right" of preference, only the requirement that it should be a "special time deposit."

There are many kinds of special deposits. We must give meaning to all words used in a statute, and, consequently, by the use of the word "time" we must understand that the deposit is to be made for some period of time.

It must be a special deposit, but the limitation that it must be a time deposit bearing interest and secured by a surety bond takes it out of that class of special deposits which are generally known as such. It is a

special deposit in that it bears interest and its repayment without loss secured by a surety deposit bond. Those are the special conditions upon which the deposits of the state insurance fund can be made in banking institutions.

The United Nevada bank deposit of $10,000 made in June, 1930, was made at a time when the amendment of 1919 was in force and effect, and in which section 40, subsec. (c), had been amended to read as follows: "The state treasurer may, upon written authority of the Nevada industrial commission, approved by the governor, deposit twenty-five (25%) per cent of said fund in a bank or banks in the State of Nevada, fifteen (15%) per cent thereof to be deposited in open accounts bearing interest at not less than three (3%) per cent per annum, and ten (10%) per cent thereof to be deposited in time accounts, bearing interest at not less than four (4%) per cent per annum."

Then follows provision for a good and sufficient surety deposit bond as set out in the former subsection. Statutes 1919, c. 176, pp. 305, 311.

No condition as to the deposits at 4 percent except the giving of a surety bond and which we find has been given.

From the many cases cited in the briefs of counsel or referred to in the cases cited, we may well apply the following: "Special circumstances must exist in order to make the deposit special instead of general, and, inasmuch as equality is equity, courts have been careful to limit the number of special circumstances which will create a special instead of a general deposit. At the risk of repetition, we might again point out that three exceptions only to the rule that a deposit will be treated as a general were recognized in City of Sturgis v. Meade County Bank, 38 S. D. 317, 161 N. W. 327, namely: (1) Where money or other thing is deposited with the understanding that that particular money or thing is to be returned to the depositor; (2) where the money or thing deposited is to be used for a specifically designated purpose; and (3) where the deposit itself

was wrongful or unlawful. Gray v. Elliott, 37 Wyo. 4, 257 P. 345, 346, 53 A. L. R. 554.

There is nothing to indicate in the present case that the identical money deposited was to be returned, nor that it was to be used for a specific purpose, nor that it was wrongful or unlawful.

In fact, as we have seen, the deposits were made in accordance with the law and as authorized by the law, and we fail to find one single element which makes these deposits anything but general deposits and not entitled to any consideration except as such general deposits.

■ That the various certificates of deposit designate them as special deposits do not make them such, but their true character must be found in the acts and intentions of the parties. Stockton Savings & Loan Soc. v. Purvis, 112 Cal. 236, 44 P. 561, 53 Am. St. Rep. 210.

■ As to the deposits in the Carson Valley bank amounting in the aggregate to $119,747.64, appellants present a different question and claim this amount was unlawfully deposited in the bank contrary to law in that it belonged to the state insurance fund and should have been turned over to the state treasurer and by him kept in accordance with our laws.

This sum, with the exception of $2,805.95, was made up of moneys paid to the commission by various persons as premiums or from other sources of revenue to which the commission was entitled and covered such receipts for a period of two and one-half months.

Section 21 of the Nevada industrial insurance act, as amended by Stats. 1925, c. 114, sec. 3 (section 2702 N. C. L. 1929), provides that: "Every employer electing to be governed by the provisions of this act * * * shall * * * as required by the Nevada industrial commission, pay to the Nevada industrial commission, for a state insurance fund, premiums in such a percentage of his estimated total pay-roll for the ensuing two months as shall be fixed by order of the Nevada industrial commission. * * *"

Thereafter this section provides that the employer

must pay the premium on his actual pay roll on or before the 25th of each succeeding month to the Nevada industrial commission.

Section 24 of this same act (section 2705 N. C. L. 1929) provides as we have seen (supra) that: "All premiums provided for in this act shall be paid to the state treasurer, and shall constitute the state insurance fund. * * * "

By these sections the law provides that the premiums shall first be paid to the Nevada industrial commission and by the commission paid to the state treasurer to constitute the state insurance fund.

All disbursements from the state insurance fund shall be paid by the state treasurer upon warrants or vouchers of the Nevada industrial commission, authorized and signed by any two members of the commission. Section 40, subsection (a) of the act, as amended (section 2721 N. C. L. 1929).

The evidence shows and is uncontradicted, that beginning in 1913 the Nevada industrial commission received its payments of premiums from employers electing to come under the act in personal checks drawn by the employer on their individual bank accounts, or that such premiums were generally paid in that manner; that the state treasurer could not or would not receive such payments in that form, but must have cash payments; that the commission then opened an account with the Carson Valley bank and deposited all its receipts in whatever form they might be in its open running account with said bank, the bank giving credit to the commission for the items thus deposited and charging back to the commission such items as had been dishonored by nonpayment when presented for payment, all in the usual course of commercial banking business and just such a course of business as carried on in its ordinary deposit accounts; at stated times, usually monthly periods, statements of the account were rendered to the commission showing the condition of the account, just as in its ordinary and usual course of business; that this account was carried in the name of the Nevada

industrial commission; that checks were drawn payable only to the state treasurer for transfer to the state insurance fund.

At first all amounts over $5,000 were turned over to the state treasurer, then finally this amount was increased to $50,000, and the bank was requested to give a surety bond to the commission as security for such deposit, and this bond was in full force and effect at the time the bank closed its doors and ceased to do business.

These retentions of the funds were all in accordance with resolutions passed by the Nevada industrial commission and copies furnished to the Carson Valley bank.

Section 24 of the act does not require an immediate payment of these funds to the state treasurer, and it is not to be presumed that it was the intention of the legislature that these payments should be other than at reasonable times, and we cannot hold that the times shown for such retention was unreasonable as the evidence shows that payments of large amounts would come in which would increase the amount in this account far beyond the amount named in the various resolutions; these checks for large amounts must first be presented and paid by the bank upon which they were drawn, the bank acting as a clearing house for these payments.

No other way for the payment of these receipts was open to the commission except to require their payment in cash, an unusual, unsatisfactory, and a very inconvenient method of payment.

This course of action by the commission must have been known to the state and through these many years have been ratified and approved by the state. As we have stated before, the state can only act through its duly constituted officers, and the governor, attorney-general, and the state mine inspector compose the industrial commission board, section 8(a), and the board shall make an audit of all books of accounts and records and of all funds and securities of the Nevada industrial commission, section 40½, and they

have the power to remove any commissioner for inefficiency, neglect of duty, or misconduct in office, section 8(b).

It is presumed "that official duty has been regularly performed." Statutes 1931, c. 50, sec. 558g, subsec. 15.

Knowing what has been the course of handling these funds by the commission and by law being the agents and representatives of the state and the only ones authorized to act in such matters on behalf of the state and taking no action to disapprove such course by removing the members of the commission, we hold that the State of Nevada through its proper officers have consented to and approved such deposit.

We therefore hold such deposits were not unlawful and did not create a trust fund in favor of the state and are only entitled to be treated as a general deposit, and entitled to no preference over other general deposits.

■ As to the item of $2,805.95, this was a working fund deposited for convenience and used for payment of minor items. While it has not been authorized by law, it has not been prohibited by law and has been so used for many years with knowledge and approval of all parties concerned in the administration of the Nevada industrial insurance act.

We hold that it is a general deposit and entitled to no greater preference than any other general deposit in the bank.

We have read with a great deal of care the able opinion of the district judge of the lower court and the able briefs of counsel and the many cases cited.

To analyze these many cases would extend this opinion beyond reasonable limits.

The decision of the lower court in both cases is hereby affirmed.

NOTE — TABER, J., having disqualified himself, the Governor designated Hon. J. M. LOCKHART, Judge of the Seventh Judicial District, to sit in his stead.