LYON COUNTY BANK MORTGAGE CORPORATION, A CORPORATION, APPELLANT, *v.* WALKER RIVER IRRIGATION DISTRICT, A CORPORATION, LYON COUNTY BANK, A CORPORATION, AND E. J. SEABORN, AS SUPERINTENDENT OF BANKS, RESPONDENTS.

No. 3173

May 5, 1937.                    67 P.(2d) 1010.

*A. L. Haight,* for Appellant:

*W. M. Kearney* and *Gray Mashburn,* Attorney-General, for Respondents:

## OPINION

By the Court, TABER, J.:

This is an appeal from a judgment of the First judicial district court, Lyon County, and from an order of that court denying a motion for new trial. Walker River Irrigation District will sometimes be referred to in this opinion as plaintiff, Lyon County Bank as the bank, Lyon County Bank Mortgage Corporation as the mortgage corporation, and Nevada Copper Belt Railroad Company as the railroad company.

On February 3, 1932, plaintiff's treasurer presented to the bank plaintiff's check drawn on said bank for $18,423.07, and at the same time handed the bank a

letter referring to and accompanying said check, in the words and figures following:

"Yerington, Nev., Feb. 1, 1932

"Lyon County Bank

"Yerington, Nevada

"Gentlemen:

"I herewith place in your hands, with the approval of the Board of Directors of the Walker River Irrigation District, for the special purpose of paying principal and interest on Walker River Irrigation District bonds the sum of $18,423.07 which sum shall be deemed and considered as a special trust fund for the aforesaid purpose and not as a deposit in which the relation of debtor and creditor exists between the undersigned Treasurer of the Walker River Irrigation District and your bank.

"Yours very truly,

"F. W. Simpson

"Treasurer, Walker River Irrigation District"

On said 3d day of February 1932, and before said check was presented, plaintiff had to its credit, on the books of the bank, a general deposit in the sum of $25,018.54. The bank accepted said check and letter and opened a new account on its books under the name of "Walker River Irrigation District Special Trust Fund." The general deposit account was charged with the amount of the check, leaving a balance in that account amounting to $6,595.47. The new account was credited with the amount of the check. Plaintiff demanded security for said balance of $6,595.47, whereupon the bank delivered to plaintiff's treasurer, out of the assets of the bank, bonds of the plaintiff in the face amount of $7,000.

Two weeks later the bank closed its doors and was taken over by the state bank examiner. Later, and within the time provided by law, plaintiff filed its claim for preference based upon said deposit of February 3. The claim was at first allowed and given preference over general creditors, and $3,000 was paid plaintiff

for the purpose of enabling it to meet interest about to accrue on its bonds. Later, however, and on January 22, 1934, the superintendent of banks disallowed said claim as a preference, and within the time allowed by law plaintiff commenced this action for the purpose of having said claim judicially established as a preferred claim. The main question to be determined is whether said claim is entitled to be preferred over those of the general depositors and other general creditors.

The legislature of 1933 passed a general banking law which was approved on March 28 of that year (Statutes of Nevada 1933, pp. 292–332, c. 190). This act superseded the banking act of 1911 (Statutes of Nevada 1911, pp. 291–313, c. 150). The office of superintendent of banks under the 1933 act corresponds to that of bank examiner under the 1911 act.

Under the provisions of section 68 of said 1933 banking act, an action was commenced against the bank by depositors representing not less than 15 percent of the total amount of the outstanding indebtedness against the bank, for the purpose of securing an order of the First judicial district court, Lyon County, directing the formation of a corporation, and ordering the bank and the superintendent of banks to convey, assign, and set over all of the property, real and personal, all stocks, bonds and notes, actions and causes of action, books and records, and all assets of every kind and character of said bank to the corporation so formed in consideration of the issuance, fully paid and nonassessable, of the capital stock of said corporation.

Pursuant to an order of said district court made at the time of the filing of said complaint, under the provisions of section 69 of the act of 1933, the superintendent of banks filed an inventory of the assets of the bank in his possession, together with his appraisal of the value thereof and his report of all claims and demands against said bank. Said inventory, appraisal, and report showed assets on the books of the bank in the amount of $605,266.07, of which $379,966.22 were good;

liabilities, $441,551.37; general claims, $287,629.90; preferred claims, $144,845.57; no claims filed, $9,075.90; claim not shown by bank's books, $241.25. At the end of the list showing general claims was the following: "Walker River Irrigation District Special Trust Fund, $15,033.07."

Upon the trial of the aforesaid action, the court granted the prayer of the complaint and by its judgment provided for the formation of the mortgage corporation, appellant herein. In ordering the transfer of the assets and property of the bank to said mortgage corporation, the court, in compliance with section 71 of said act of 1933, further ordered and directed that sufficient of the cash and assets of the bank be retained by the superintendent of banks to meet and make payment of any claims which then were or which should thereafter be declared to be preferred claims or trust funds. In obedience to the last-mentioned court order the superintendent of banks retained, for the purposes aforesaid, cash and assets of the bank in the amount of $59,201.33. In determining the amount to be so retained, the superintendent of banks had in mind, among other claims for preference, that of plaintiff amounting to $15,033.07, being the amount of the original claim less the $3,000 paid thereon as aforesaid. Said section 71 provides in part that "if there be a surplus of such cash and assets so retained by the superintendent of banks after the payment of any such preferred claims or trust funds, then such surplus shall be paid or delivered over to such new corporation."

In its findings of fact in said district court action, the court found that when the bank closed its doors there was owing to creditors and depositors $475,667.56, including Lyon County public funds to the amount of $95,997.79; that on October 25, 1933, when said findings of fact were made, the amount owing to creditors and depositors was $434,706.88 (including public funds), or $342,459.90 (not including public funds); that the value of the bank's assets was $391,996.22;

and that claims or trust funds alleged to be entitled to preference amounted to $144,845.57.

Among the claims alleged to be entitled to preference was that based on an account carried on the books of the bank as "Lyon County Bank, Trustee for Bondholders of N. C. B. R. R." (Nevada Copper Belt Railroad). The balance in this fund on January 30, 1932, was $18,321.80; on February 1, 1932, $18,274.30; on February 2, 1932, $16,671.80; and on February 16, 1932, when the bank closed, $18,789.30. All of the claims alleged to be entitled to preference have been disposed of except those of plaintiff and the railroad. Appellant contends that the undisbursed balance in the railroad trust fund held by the bank constituted, without question, a trust fund for the benefit of the individual bondholders. Besides the $3,000 paid out by the bank examiner to plaintiff, there was about $2,000 paid to others claiming trust funds and preferences.

When the bank closed its doors and for a long time prior thereto, including the first week of February 1932, J. I. Wilson was president of the bank and president of plaintiff corporation, while Frank Simpson was vice president of the bank and plaintiff's treasurer. Mr. Wilson was also receiver of the railroad by virtue of appointment as such by the judge of the United States district court for the district of Nevada.

On June 3, 1932, the bank examiner wrote the following letter to plaintiff's secretary:

"Consolidated Offices
"State Auditor
"State Bank Examiner
"Nevada Tax Commission

"Carson City, Nevada
"June 3, 1932

"Mr. S. P. Kafoury, Secretary
 "Walker River Irrigation District
 "Yerington, Nevada
"Dear Mr. Kafoury:
 "Confirming our conversation of yesterday, I have

received a ruling from Attorney General Mashburn to the effect that those of your deposits with the Lyon County Bank and the Mason Valley Bank which were made for the specific purpose of meeting interest payments and which were tendered and received as trust deposits do, in fact, constitute trust funds and are entitled to preference.

"Such being the case, I will pay those of your claims which are predicated upon the above facts, together with other approved trust claims before any dividends are paid to general creditors.

"The Mason Valley Bank is in a position to pay any trust claims which may conceivably be brought against it and you may expect payment of your trust claim against that bank within the next thirty days. However, the Lyon County Bank has no funds in excess of reasonable margin for emergency needs and it will probably be some time before you may expect any material dividend on your trust claim against that institution.

"Yours very truly,<br>"E. J. Seaborn

"EJS: ES     State Bank Examiner"

On January 22, 1934, the superintendent of banks wrote the following letter to plaintiff:

"January 22, 1934

"Walker River Irrigation District
 "Yerington, Nevada
"Gentlemen:

"You are hereby notified that your claim for preference against the assets of Lyon County Bank in the amount of $15,033.07 has this day been disallowed as a preference claim but allowed as an ordinary claim without preference.

"In connection with this notice of rejection, I desire to state that claims for preference which in my opinion would otherwise be allowable, have been filed against the assets of the above mentioned bank to an amount

greatly in excess of the cash on hand or on deposit in solvent banks at the time I took possession of the bank. The legal question as to whether a valid preference or trust claim against the lien upon all of the assets of the bank or only against the cash at its lowest point has never been determined in this state. Therefore, I deem it necessary to reject the claim in order that an adjudication may be had.

"Yours very truly,

"E. J. Seaborn

"Superintendent of Banks

"EJS : L          in charge Lyon County Bank"

It seems plain that the bank was in an insolvent condition on February 3, 1932, as well as for a considerable period of time prior thereto; the expression "insolvent condition" being here used in the sense of a substantial deficiency of good assets to cover the bank's liabilities.

One of the witnesses called by plaintiff was George F. Willis, who had worked for the bank for twenty-eight years and had been its cashier for about twenty-five years. When Mr. Willis was asked on cross-examination whether he could have cashed plaintiff's check at the time it was presented if the cash had been demanded, he replied, "No sir, I could not." The trial court, both in its written decision and findings of fact, stated that when plaintiff's check was presented on February 3, 1932, the bank did not have sufficient cash on hand to pay plaintiff's check.

On February 2, 1932, the bank had $6,565.65 in other banks. This amount added to the $12,160.15, cash actually on hand in the bank, amounts to $18,725.80, which is $302.73 more than plaintiff's deposit of $18,423.07 made on February 3, 1932. The aforesaid item of $6,565.65 included one day's accumulation of checks on other banks, which might or might not be paid. One check on an outside bank in the amount of $131.40 was in fact not paid. It was included in the bank's balance of February 1 or 2, but was returned

on February 5. Money on hand in the bank February 1, 1932, amounted to $12,754.97, including stamps and uncollected cash items; on February 2, 1932, the amount on hand, exclusive of postage stamps and uncollected cash items, was $12,160.15. It was the custom of the bank to keep on hand from $20,000 to $25,000.

From February 3, 1932, to the time when the bank closed about two weeks thereafter, only $390 had been withdrawn from the special trust fund. Each of the three checks making up said amount was drawn on said fund, the checks being signed by the proper officials of plaintiff corporation. Each of said checks was given in payment of accrued interest on bonds of the plaintiff. With respect to two of these transactions, the record shows that the interest coupons were brought to the office of plaintiff by a representative of the bank, who in each instance requested and received a voucher for the bank's records. Mr. Willis testified that most of the interest for which the $18,423.07 was set aside would not have been payable until about the 1st of July 1932.

No new signature card was executed at the time of or in connection with plaintiff's deposit on February 3. Plaintiff retained full control over that deposit. No money could be paid from that fund except on the check of one or more of plaintiff's three officers hereinbefore mentioned. The bank was not given any instructions besides those contained in the letter handed it on February 3 when the check for $18,423.07 was presented. There was no special understanding that this fund should not be commingled with the general funds of the bank. Mr. Willis testified that the bank was bound to honor any checks drawn against this fund which bore the signatures of plaintiff's said officers. Though the bank did not have sufficient cash on hand to pay plaintiff's check on February 3, 1932, it did have securities sufficient to obtain cash with which to pay it. Mr. Willis was asked by counsel for the irrigation district: "That check could have been honored very easily from

the assets you had on hand, by hypothecating your assets in the ordinary course of business, could it not?" He replied: "Well, I presume so, by raising money, or a loan."

The funds deposited by plaintiff on February 3, 1932, as well as those which had been deposited in the railroad trust fund, were mingled with the general funds of the bank, used to acquire securities, and invested in bonds, loans, and mortgages. With reference to plaintiff's deposit of February 3, 1932, and the railroad trust fund, Mr. Willis gave the following testimony on cross-examination:

"Q. Mr. Willis, may I ask you, once and for all, and let's get a final answer on this, did you invest that particular money in any particular securities? A. I don't know; it is a hard question, Mr. Haight.

"Q. All right; isn't it a fact that what you did do was put this cash along with all the other cash you had in the bank, and whatever securities were purchased were purchased out of the jackpot? A. I guess that is right.

"Q. And you didn't purchase any particular securities with Walker River Irrigation money, did you? A. No particular money. To identify the particular money, I don't know how you would identify it.

"Q. You couldn't identify it because it wasn't purchased with that particular money, was it? A. No.

"Q. And the same is true with the Nevada Copper Belt fund? A. Yes sir."

When the bank closed on February 16, 1932, it had $1,284.17 cash on hand and $4,880.79 in other banks.

Mr. Willis testified that the $18,423.07 check presented to the bank by plaintiff on February 3 was honored as cash.

Included within the assets of the bank, on the day it failed, were bonds of plaintiff corporation.

It was understood between the bank and plaintiff, as well as between the bank and other large depositors,

that before making any heavy withdrawals they would give the bank ample notice.

No interest was to be paid by the bank on the deposit made by plaintiff on February 3. It does not appear from the record that the bank was to receive any compensation for handling said fund.

Mr. Willis testified that many of the bonds, notes, and other securities purchased with the railroad trust fund and plaintiff's said special fund were still among the bank's assets, and that many of the bank's depositors have been benefited by reason of the fact that the superintendent of banks still has some of the securities so acquired. Mr. Willis went on to testify as follows:

"Q. The money that was paid in on those securities that were paid off, was that or was it not paid to depositors or other creditors of the bank? A. It was paid to depositors and creditors both. As long as the bank was doing business it was paid out to creditors and depositors.

"Q. By virtue of that payment to the depositors and creditors, have the liabilities of the bank been reduced? A. To quite an extent, yes sir.

"Q. So that all the funds deposited by the Walker River Irrigation District, in question here, as well as those funds deposited by the Receiver of the Nevada Copper Belt Railroad Company, either exist in the form of securities now in the hands of the Bank Receiver, or have served to reduce the liabilities of the bank, is that correct? A. I would say so, yes. We reduced the liabilities during the last year we were in operation something over one hundred thousand dollars.

"Q. And that was all done in the regular course of business? A. Yes sir.

"Q. Through the bank? A Yes sir.

"Q. And all accounted for in the reduction of bank liabilities or the acquirement of assets which are now available in the bank, is that correct? A. Yes sir.

"Q. Could you, from day to day, take your daily

sheets and deposits, and your daily loans, and purchase of bonds, and determine the moneys that were used to acquire particular securities or notes? A. Yes."

Plaintiff brought this action under the provisions of section 56 of the 1933 banking act. That section requires the superintendent of banks to publish notice calling on all persons having claims against an insolvent bank, "other than claims as mere depositors therein," to present same and make legal proof thereof within a specified time. "An action upon a claim so rejected must be brought within three months after such service, and a judgment for such claim shall have the effect only of placing the claim on the same basis as an approved claim, and shall create no lien or preference on the property or assets in the hands of the superintendent of banks, nor shall any execution be issued on such judgment." The last-quoted provision was also in section 56 of the 1911 banking act. Section 705 N. C. L.

Section 10d of the Nevada irrigation district act of 1919 (section 8021 N. C. L.) was added to that act in 1929, and was in effect until amended in 1933 (Stats. 1933, c. 186, sec. 3). It read as follows: "All moneys belonging to or in the custody of any irrigation district within this state, or of the treasurer or other officer thereof shall, so far as possible, be deposited in such state or national bank or banks in this state as the treasurer or other officer of such irrigation district having legal custody of said moneys shall select for the safe-keeping thereof, and shall be subject to withdrawal at any time on demand of the treasurer or other authorized officer. For the security of such deposits there shall be delivered to the treasurer of such irrigation district a bond or bonds of a corporate surety qualified to act as sole surety on bonds or undertakings required by the laws of this state, and approved by the insurance commissioner of this state as a company possessing the qualifications required for the purpose of transacting a surety business within this state; *provided,* that the

penal amount of such bond or bonds shall at no time be less than the amount of money deposited by such irrigation district with such depositary; said bond or bonds shall secure and guarantee the full and complete repayment to such irrigation district or the payment to its order of all funds so deposited together with interest thereon. The premium for such corporate surety bond or bonds, in the discretion of the directors of the irrigation district, may be paid out of the funds so deposited or may be required to be paid by the depositary; *provided, however,* that said depositary may, in lieu of said corporate surety bond or bonds, deposit with the treasurer of such irrigation district treasury notes or United States bonds, or other securities which are legal investments for savings banks in this state, the market value of which shall at all times equal the amount of funds so deposited, as collateral security, and such securities shall be placed by such treasurer in escrow in some bank other than the depositary of the funds of such district. In the event of the failure of the depositary to repay such funds to the district on demand, or to pay the same to its order, the securities so placed in escrow shall be redelivered to the treasurer and may be sold by him with or without notice, and the proceeds thereof used to reimburse the district. The provisions of this section, however, shall not apply to deposits made for the purpose of paying the principal or interest due on any bonds of such district, and the treasurer or other custodian of such funds of such district may, with the approval of the board of directors of such district, deposit money in any bank or banks within or without this state in such amount as shall be necessary for the payment of the principal and interest of such bonds at the place or places at which the same are payable and under such conditions as the board of directors shall determine."

There being no substantial conflict in the evidence, this court is called upon to decide the law applicable to the facts in this case.

In determining whether a preferred lien against the estate of an insolvent should be allowed, the following rule was adopted as the correct one by the supreme court of Arizona in the case of Jarvis v. Hammons, 32 Ariz. 444, 259 P. 886, at pages 889, 890: "The right to recover a trust fund in full from the assignee or receiver of an insolvent debtor depends upon several things, the three principal ones being: First, the establishment of the fact that the deposit of the money with the debtor was made under circumstances creating a trust; second, an affirmative showing that by reason of the transaction the actual, physical assets coming into the hands of the receiver or assignee were augmented by the transaction; and third, the ability of the claimant to trace his deposit, either in its original form or in a changed form, into the hand of the receiver."

In Stilson v. First State Bank, 149 Iowa, 662, 129 N. W. 70, at page 72, the court said: "The creditor who asks that his claim be given preference has the burden of showing that his money has come into the hands of the assignee as an increase of the assets of the estate, and that it may be taken therefrom without impairing the rights of general creditors."

The rule laid down in Las Vegas Savings Bank v. Casey (D. C.) 15 F. Supp. 412, 414, is as follows: "It is uniformly the holding of the court on this subject, that, in order to entitle one to preferential payment out of the assets of an insolvent bank, three essential elements must appear: (1) A trust relation; (2) augmentation of the assets of the bank; (3) the fund traced into the hands of the receiver."

■ The mere fact that a deposit is a trust fund, or special deposit, or deposit for a specific purpose, does not necessarily entitle a claim based thereon to a preference over general depositors. Bradley v. Chesebrough, 111 Iowa, 126, 82 N. W. 472; West St. Louis Trust Co. of St. Louis v. Brokaw (Mo. App.), 102 S. W. (2d) 792; Zollmann, Banks and Banking, vol. 10, pp.

60, 123; Michie, Banks and Banking, vol. 3, pp. 225, 226.

■ It is frequently necessary to take into account the acts and intentions of the parties in determining whether a claim is entitled to preference. State v. Carson Valley Bank, 56 Nev. 133, at page 147, 47 P. (2d) 384.

■ It is also to be borne in mind, in a case of this kind, that before awarding the claim a preferential status, it must be made to appear that the claimant is entitled to preference on equitable principles. Board of Fire & Water Commissioners v. Wilkinson, 119 Mich. 655, 78 N. W. 893, at pages 895, 896, 44 L. R. A. 493; Zollmann, Banks and Banking, vol. 10, pp. 2, 140; Michie, Banks and Banking, vol. 3, p. 293.

■ One claiming a preference over general depositors has the burden of proving clearly his right to enjoy such preference. In re Citizens Bank of Senath (Mo. App.), 102 S. W. (2d) 830, at page 832; Security Nat. Bank Savings & Trust Co. v. Moberly (Mo. Sup.), 101 S. W. (2d) 33; Michie, Banks and Banking, vol. 3, p. 253; Zollmann, Banks and Banking, vol. 10, sec. 6652.

We shall now direct our attention to the particular principles and rules of law applicable in the instant case.

Plaintiff at no time parted with its control of the so-called special trust fund. It is true that in its letter to the bank, dated February 1, 1932, and handed to the bank on the 3d day of that month at the same time that the check for $18,423.07 was presented, plaintiff designated the fund as a special trust fund and further expressly stated that it was not to be deemed or considered as a deposit in which the relation of debtor and creditor was to exist; but no duty or responsibility was imposed upon the bank, nor any power or authority given it other than to pay checks out of said fund, signed by the proper officers of plaintiff corporation. Plaintiff's letter stated that the deposit was made for the special purpose of paying principal and interest on

the Walker River irrigation district bonds, and as a matter of fact no checks were drawn on that fund except for the payment of interest on said bonds; but the bank was not instructed that it was not to honor any checks given for other purposes. The true situation was disclosed by Mr. Willis when he testified that the bank would have been bound to honor any checks drawn on said fund, provided they were signed by the proper officers of plaintiff corporation. As was said in the case of In re Interborough Consolidated Corporation (C. C. A.), 288 F. 334, 346, 32 A. L. R. 932, at page 944: "The fund here in controversy and deposited in the Empire Trust was not received by the latter under instructions to distribute it among specified creditors, or to the coupon holders. It was received by the Empire Trust to be paid out on account checks to be drawn by the Interborough and directed to be charged against the separate account which had been created."

In the same case the court said: "If a fund is deposited in a bank for a specific purpose, but subject to the depositor's check, it remains the property of the depositor, and is subject to the right of set-off. * * * Such a right is necessarily inconsistent with the existence of a trust."

In the case of Guidise v. Island Refining Corporation (D. C.), 291 F. 922, 923, the eminent learned Hand, then United States district judge for the southern district of New York, now judge of the United States circuit court, second circuit, used this language: "The fact that the fund remains subject only to the obligor's order has usually been deemed enough to rebut the inference of a trust. There must be some intention to give the beneficiary irrevocable rights in the res, and that scarcely comports with the obligor's sole right to draw. That was the case in Re Interborough Consolidated Corporation (Ex parte Gustave Porges), 288 F. 334 [32 A. L. R. 932] (C. C. A. 2, January 16, 1923), and it is authoritative on me even if I did not agree

with it, which (though that makes no difference) I do."

In a concurring opinion in Fant v. Home Bank & Trust Co., 152 S. C. 140, 149 S. E. 599, 600, Justice Stabler said: "It was agreed by all parties that the moneys received from the Hill Chevrolet Company were to be deposited in the bank in the name of Prothro, subject to his order, or for the purpose of readvancement to the company. It is therefore clear that Prothro, under the terms of the agreement, could check out of the bank at any time, for purposes other than for readvancement to the company, the whole or any part of the funds so deposited, and that the bank would be bound to honor his orders. From this it is evident that the fund so placed in the bank was an ordinary and not a special deposit, and that Prothro is not entitled to the preference claimed."

In Bacon v. State Bank of Kamiah, 41 Idaho, 518, 240 P. 194, at page 197, the court said: "Appellant's exercise of control over the fund by drawing against it indicates that the bank's contract as to this deposit was the same as to any ordinary deposit, viz., to repay it in money on the demand or order of the depositor."

The irrigation company contends that its deposit of February 3, 1932, augmented the assets which came into the hands of the bank examiner. We do not concur in this view.

In the case of Hornick, More & Porterfield v. Farmers' & Merchants' Bank, 56 S. D. 18, 227 N. W. 375, 377, 82 A. L. R. 16, the court said: "But no fund, in the sense of new and additional money, came into the control or possession of the bank in this case. A transaction with the bank by which the account of one depositor is charged for or debited with the amount of check and another account is given a corresponding credit does not augment or increase the assets of the bank, and does not bring into existence a fund of money to which a trust may attach. Beard v. Independent District (C. C. A.), 88 F. 375, 382; Empire State Surety

Co. v. Carroll County (C. C. A. 8th Cir.), 194 F. 593, 606; Milligan v. First State Bank [55 S. D. 528], 226 N. W. 747."

■ There is a sharp conflict of authority on the question whether a check, drawn on an insolvent bank by a drawer who has sufficient funds on deposit to meet it, and deposited by the payee in his account with the drawee bank, amounts to an augmentation of the funds of the bank. Annotation, 82 A. L. R. at page 97; Bogert, Trusts and Trustees, vol. 4, pp. 2662–2667; Zollmann, Banks and Banking, vol. 10, sec. 6642. But in any event the bank must have on hand cash equal to or exceeding the amount of the check. Annotation, 82 A. L. R. at page 97; Zollmann, Banks and Banking, vol. 10, p. 121.

■■ It has not been satisfactorily shown that at the time of the presentation of plaintiff's $18,423.07 check the bank had sufficient money on hand with which to pay the check. If it be conceded that money in other banks should be regarded as cash in such a situation (Reichert v. United Savings Bank, 255 Mich. 685, 239 N. W. 393, 82 A. L. R. 33, at pages 37, 39), it must be remembered that while, according to its books, it had to its credit in solvent banks on February 2, 1932, the sum of $6,565.65, there was included in this balance a one day's accumulation of checks on other banks, and that one of these checks, in the amount of $136.40 (including protest fees), was dishonored. It is our opinion that these checks, though entered as cash on the books of the bank, should not be considered, legally, as having been such before they were honored. The aggregate amount of these checks not appearing from the record, it is impossible to say whether there was sufficient money on hand in the bank on February 3, 1932, to pay plaintiff's check. This does not satisfy the law, which requires a clear showing on every fact essential to entitle claimant to a preference.

When we consider that the bank was in failing condition on February 3, 1932, and that it was entitled to

ample notice of large withdrawals, the conclusion seems irresistible that if plaintiff had demanded cash when its check was presented on said date, it would not have received it before the bank failed.

The irrigation district argues that if the trust funds were used to pay off depositors, the liabilities of the bank were reduced accordingly. On this point the court, in Schumacher v. Harriett (C. C. A.), 52 F. (2d) 817, 818, 82 A. L. R. 1, at page 4, has this to say: "The rule is well settled that where property or funds which are the subject of a trust are used by a bank in such way as merely to decrease its liabilities and not to augment its assets, no charge upon the assets arises in favor of the cestui que trust. Ellerbe v. Studebaker Corporation of America (C. C. A. 4th), 21 F. (2d) 993; First National Bank of Ventura v. Williams (D. C.), 15 F. (2d) 585; City Bank v. Blackmore (C. C. A. 6th), 75 F. 771." To the same effect, see Zollmann, Banks and Banking, vol. 10, pp. 102, 103, 104, 109.

■ There is a further reason why plaintiff should not be given a preference on his claim, and it is this: There was no understanding that the fund deposited in the bank for a special purpose was not to be used by the bank for its own purposes. Security Nat. Bank Savings & Trust Co. v. Moberly (Mo. Sup.), 101 S. W. (2d) 33; Restatement of the Law, Trusts, vol. 1, p. 46; Squire v. American Express Co., 131 Ohio St. 239, 2 N. E. (2d) 766.

The conclusion we have arrived at is that plaintiff's claim is neither a trust fund nor preferred claim within the meaning of the statute, and that the district court erred in giving said claim the rank and preference of a first preferred claim.

■ In its briefs and at the oral argument appellant urged that this court order a proper distribution of the $59,201.33 cash and assets retained by the superintendent of banks for payment of preferred claims or trust funds. It also requested that in case this court should hold that plaintiff's claim is not entitled to preference,

plaintiff be ordered to return the $3,000 paid it by the bank examiner. In view of the wording of section 56 of the 1933 banking act, under the provisions of which this action was brought, it is our opinion that this court has properly limited its inquiry to the single question whether the district court was correct in awarding a preference to plaintiff's claim.

The judgment and order appealed from are reversed.

### ON PETITION FOR REHEARING

August 19, 1937.

*Per Curiam:*

Rehearing denied.